Filed 1/15/16 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOVANA HERNANDEZCUEVA, Individually and as Successor-in-interest, etc.,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>E.F. BRADY COMPANY, INC.,<br><br>      Defendant and Respondent. | B251933<br><br>(Los Angeles County<br>Super. Ct. No. BC475956)<br><br><br>ORDER MODIFYING OPINION<br><br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on December 22, 2015 be modified as follows:  On page 23, lines 11 through 18, delete:

"However, the contention fails under the collateral source rule, which bars a defendant from shielding itself from liability for injuries by identifying a source of compensation for the plaintiff that is wholly independent of the defendant.  (*Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 349; *McKinney v. California Portland Cement Co.* (2002) 96 Cal.App.4th 1214, 1221-1227.)  The record is devoid of

evidence that the Hernandezcuevas may receive compensation from any bankruptcy trust related to E. F. Brady.  Accordingly, we reject the contention."

And substitute:

"However, the contention fails, as amicus curiae has identified no evidence that the Hernandezcuevas have received compensation from any bankruptcy trust.  (See *McCall v. Four Star Music Co.* (1996) 51 Cal.App.4th 1394, 1399 [under California law, tortfeasor is not relieved of liability to plaintiff under judgment by joint tortfeasors' partial payment of plaintiff's damages]; *Yates v. Nimeh* (N.D. Cal. 2007) 486 F.Supp.2d 1084, 1087-1088 [same]; *Winzler & Kelly v. Superior Court* (1975) 48 Cal.App.3d 385, 393 [unsatisfied judgment against tortfeasor does not shield joint tortfeasors from liability to plaintiff]; *Paulus v. Crane* (2014) 224 Cal.App.4th 1357, 1367 [plaintiff's potential future recovery from asbestos bankrupty trusts supported no reduction of damages tortfeasor owed under judgment]; *Hellam v. Crane* (2015) 239 Cal.App.4th 851, 872-873 [same].)"

The modification does not change the judgment.

_____

*EPSTEIN, P. J.,                     MANELLA, J.                     COLLINS, J.

2

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOVANA HERNANDEZCUEVA, Individually and as Successor in Interest, etc. <br><br> Plaintiff and Appellant, <br><br> v. <br><br> E. F. BRADY COMPANY, INC., <br><br> Defendant and Respondent. | B251933 <br> (Los Angeles County <br> Super. Ct. No. BC475956) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph Di Loreto, Judge.  Affirmed in part, reversed in part, and remanded with directions.

The Arkin Law Firm and Sharon J. Arkin; Farrise Firm and Simona A. Farrise for Plaintiff and Appellant.

---

\*	Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part B of the Discussion and all its subparts.

Sherman Breitman, Jerry C. Popovich and N. Asir Fiola for Defendant and Respondent.

Crowell & Moring and Kevin C. Mayer as Amicus Curiae Coalition for Litigation Justice, Inc. in support of Defendant and Respondent.

Crawford & Bangs and E. Scott Holbrook as Amicus Curiae for American Subcontractors Association, The Association of the Wall and Ceiling Industry, and The Roofing Contractors Association of California in support of Defendant and Respondent.

_____

Joel and Jovana Hernandezcueva asserted claims for negligence and strict products liability, together with several related claims, against respondent E. F. Brady Company, Inc. (E. F. Brady), alleging that asbestos-containing products it distributed caused Joel Hernandezcueva's mesothelioma. At trial, following presentation of the Hernandezcuevas' case-in-chief, the court granted E. F. Brady's motion for nonsuit on their claim for strict products liability and some related claims. After the jury returned special verdicts against the Hernandezcuevas on their negligence claim, they filed an unsuccessful motion for a new trial.

Appellant Jovana Hernandezcueva challenges the rulings on the motions for nonsuit and a new trial.[1] In the published portion of this decision, we conclude the trial court erred in granting a nonsuit on the strict products liability claim because the Hernandezcuevas' evidence sufficed to show that E. F. Brady, while acting as a

---

[1] During the pendency of this appeal, Joel Hernandezcueva died. For purposes of the appeal, Jovana Hernandezcueva has been designated his successor in interest.

2

subcontractor in the construction of a commercial building, was in the stream of commerce relating to the asbestos-containing products, for purposes of the imposition of strict liability. In the unpublished portion of this decision, we conclude the court properly denied a new trial. We therefore affirm in part, reverse in part, and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Pretrial Proceedings*

E. F. Brady is a subcontractor engaged in drywall installation and plastering. During the mid-1970's, E. F. Brady participated in the construction of a complex of buildings in Irvine for the Fluor Corporation (Fluor). In the 1990's, Joel Hernandezcueva worked as a janitor in the Fluor complex. In or after 2011, he was diagnosed as suffering from mesothelioma, which is a cancer of the "pleura" of the lung.

In December 2011, the Hernandezcuevas initiated the underlying action against several defendants. In February 2013, E. F. Brady was added as a Doe defendant. The Hernandezcuevas' first amended complaint, filed May 6, 2013, asserted claims for negligence, strict liability, misrepresentation, intentional failure to warn, premises owner and contractor liability, and loss of consortium against numerous manufacturers, suppliers, and distributors of asbestos-laden products. The complaint alleged that Joel Hernandezcueva's mesothelioma resulted from his exposure to asbestos from the defendants' products. The Hernandezcuevas sought compensatory and punitive damages.

3

B. *Trial*

By September 19, 2013, when the Hernandezcuevas began presenting their case-in-chief, only E. F. Brady and two other defendants remained in the action, Expo Industries (Expo) and Kaiser Gypsum Company (Kaiser).

1. *Hernandezcuevas' Evidence[2]*

E. F. Brady was founded in 1946. As a subcontractor, it focused on plastering and the installation of drywall and fireproofing materials. By the early 1970's, it employed 350 to 1000 "field employees," that is, plasterers, drywall hangers, and workers in related trades. In 1972 or 1973, E. F. Brady first became aware that asbestos in materials that its employees used was potentially hazardous. E. F. Brady never tested the materials it used to determine whether they contained asbestos.

In the early 1970's, Fluor initiated the construction of a complex of buildings in Irvine to house the engineering facilities of its southern California division. The complex was to occupy approximately 600,000 square feet on a 104-acre lot in Irvine. C. L. Peck was the project's general contractor. In August 1974, construction of the Fluor complex commenced.

According to Vincenzo Lombardo, who testified as the person most knowledgeable regarding E. F. Brady, the company submitted a bid to install the fireproofing, metal stud framing, and drywall. Because subcontractors were ordinarily required to provide construction materials, the bid included labor and material. Although E. F. Brady's profits arose from its provision of labor, the bid

---

[2]     We limit our summary to the Hernandezcuevas' evidence supporting their claims against E. F. Brady, as some of their evidence was admitted solely against other defendants.

4

included the costs E. F. Brady would incur in purchasing the materials, plus a "one or two percent" charge for "escalation of cost[s] of the material[s]." E. F. Brady generally bought the drywall and fireproofing materials it installed from supply houses.

E. F. Brady was engaged as the drywall subcontractor for the Fluor complex project. Under the contract, E. F. Brady was to be paid $2,024,272. The contract obliged E. F. Brady to select the drywall and related materials in accordance with the general contractor's plans and specifications. The specifications called for asbestos-free fireproofing and insulation, but contained no analogous requirement regarding the drywall material and joint compound (also called "taping mud").

E. F. Brady installed drywall made by Kaiser, and initially used Kaiser's "all purpose" joint compound to finish the drywall joints. When that joint compound proved to be ineffective, E. F. Brady substituted a joint compound made by Hamilton. E. F. Brady bought the drywall and joint compounds from Expo, which delivered those materials to the work site.

William Longo, a material scientist, testified that Kaiser drywall and the Hamilton joint compound installed by E. F. Brady in the Fluor complex contained asbestos. Neither the drywall nor the joint compounds were labeled as containing asbestos. Warren Bozzo, who supervised E. F. Brady's work on the Fluor complex, testified he was unaware that the drywall and joint compounds used in the project contained asbestos.

Joel Hernandezcueva was born in 1968. From 1992 or 1993 to 1995, he worked as a janitor at the Fluor complex. During that period, areas of the complex were remodeled, and certain walls within the complex were continuously under repair. E. F. Brady did not participate in those activities.

Hernandezcueva's duties included cleaning up drywall debris and other rubbish from areas where E. F. Brady had installed the original drywall and

5

fireproofing.  While performing those duties, he inhaled dust.  In or about 2011, he was diagnosed as suffering from mesothelioma.

The Hernandezcuevas' experts testified that Joel Hernandezcueva's exposure to asbestos released from the products installed by E. F. Brady caused his mesothelioma, which was well advanced at the time of trial.  Longo stated that Hernandezcueva was exposed to asbestos from those products when he worked at the Fluor complex.  Arnold Brody, a research scientist, testified that by 1974, it was well established that asbestos caused mesothelioma.  According to Brody, there is no minimal threshold of exposure to asbestos below which the exposure is "safe."  He opined that Hernandezcueva's exposure to asbestos from products installed by E. F. Brady significantly contributed to his risk of mesothelioma.  Dr. William Salyer, a pathologist, also opined that to a reasonable degree of medical certainty, Hernandezcueva's mesothelioma was causally related to his exposure to asbestos.  Dr. Reginald Abraham, a cardiovascular surgeon, testified that Hernandezcueva was likely to die within a year.

### 2.  *Motion for Partial Nonsuit*

Following the completion of the Hernandezcuevas' case-in-chief, E. F. Brady filed a motion for partial nonsuit on their claims for strict liability, misrepresentation, and intentional failure to warn, as well as their request for punitive damages.  The trial court granted the motion with respect to the claims for strict liability, misrepresentation, and intentional failure to warn, but denied it with respect to the request for punitive damages.  The negligence claim remained.

### 3.  *E. F. Brady's Evidence*

When E. F. Brady began presenting its evidence, it was the sole defendant participating in the trial.  E. F. Brady presented testimony from Lombardo, who

6

stated that during the pertinent period, the uniform building code did not prohibit the use of drywall and joint compounds containing asbestos.

E. F. Brady also presented testimony from Gary Paoli, who was employed by Raymond Interior Systems, which engaged in the installation of metal stud framing and installation in the Los Angeles area. In 1973, Raymond Interior Systems submitted an unsuccessful bid to perform the work on the Fluor complex project ultimately done by E. F. Brady. Paoli testified that asbestos did not become a "hot topic" among drywall and plastering contractors in Southern California until the 1980's. According to Paoli, he first learned that asbestos caused cancer in the early 1980's.

### 4. *Verdicts*

In view of the ruling on the motion for partial nonsuit, the jury was instructed to return special verdicts relating solely to the Hernandezcuevas' negligence claim and request for punitive damages. The jury found that although Joel Hernandezcueva had been exposed to asbestos from a product installed by E. F. Brady, the company was not negligent regarding that exposure.

### C. *Judgment and Motion for a New Trial*

On October 9, 2013, the trial court entered a judgment in favor of E. F. Brady and against the Hernandezcuevas on their claims. The Hernandezcuevas filed a motion for a new trial predicated on judicial misconduct, which the trial court denied.

## DISCUSSION

Appellant challenges the grant of nonsuit with respect to the claim for strict liability, and the denial of the motion for a new trial.[3]  For the reasons discussed below, we conclude the trial court erred in granting a nonsuit, but not in denying a new trial.

### A.  *Nonsuit*

We begin with appellant's contention regarding the grant of nonsuit on the Hernandezcuevas' strict liability claim.  Relying primarily on *Monte Vista Development Corp. v. Superior Court* (1991) 226 Cal.App.3d 1681 (*Monte Vista*), E. F. Brady argued that it was entitled to a nonsuit because the Hernandezcuevas' evidence showed only that it was a subcontractor that had installed asbestos-containing products bought from other parties.  The trial court agreed.  Appellant contends that strict liability is properly imposed on E. F. Brady for injuries arising from asbestos released from the products it purchased and installed.

#### 1.  *Standard of Review*

"'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.' [Citation.]  In determining the sufficiency of the evidence, the trial court must not weigh the evidence or consider the credibility of the witnesses.  Instead, it must interpret all of the evidence most favorably to the plaintiff's case and most strongly against the defendant, and must resolve all presumptions,

---

[3]     Although nonsuit also was granted on other claims asserted by the Hernandezcuevas, appellant does not challenge that aspect of the trial court's ruling.

inferences, conflicts, and doubts in favor of the plaintiff. If the plaintiff's claim is not supported by substantial evidence, then the defendant is entitled to a judgment as a matter of law, justifying the nonsuit. [Citation.]" (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541, quoting *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) We review rulings on motions for nonsuit de novo, applying the same standard that governs the trial court. (*Saunders v. Taylor*, *supra*, 42 Cal.App.4th at pp. 1541-1542 & fn. 2.)

### 2. *Governing Principles*

The key question before us concerns the application of the doctrine of strict products liability under the circumstances established by the Hernandezcuevas' evidence. That doctrine is traceable to *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 59-60, in which our Supreme Court held that manufacturers of defective products are subject to strict liability for injuries to consumers arising from their products. The court explained that "[t]he purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market[,] rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.) Thereafter, the doctrine was extended to other parties involved in the vertical distribution of products such as retailers, wholesalers, and developers of mass-produced homes. (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 772-773 (*Bay Summit*).) Although not necessarily involved in the manufacture or design of the final product, those parties were subject to liability for "passing the product down the line to the consumer" because they "were 'able to bear the cost of compensating for injuries' [citation] and 'play[ed] a substantial part in insuring that the product [was] safe or . . . [were] in a position to exert pressure on the manufacturer to that end.' [Citation.]" (*Id*. at p. 773.)

9

"[U]nder the stream-of-commerce approach to strict liability[,] no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability.  It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability." (*Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 725 (*Kasel*).)

Imposition of strict liability under the stream-of-commerce theory is not limitless.  (*Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1535 (*Arriaga*).)  To be subject to strict liability, a party must "play more than a random and accidental role in the overall marketing enterprise of the product in question." (*Garcia v. Halsett* (1970) 3 Cal.App.3d 319, 326 (*Garcia*).)  "[S]trict liability is not imposed even if the defendant is technically a 'link in the chain' in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied.  Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants.  [Citations.]" (*Arriagaa*, *supra*, 167 Cal.App.4th at p. 1537.)

Our inquiry concerns the propriety of imposing strict liability on a subcontractor that bought and installed defective products in fulfilling its contract.  Because E. F. Brady provided a service in passing the defective asbestos-products to the ultimate user, our focus is the principles governing such situations.  Generally, the imposition of strict liability hinges on the extent to which a party was "responsible for placing products in the stream of commerce." (*Pierson v.*

10

*Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 344 (*Pierson*), italics deleted.)  When the purchase of a product "is the primary objective or essence of the transaction, strict liability applies even to those who are mere conduits in distributing the product to the consumer."  (*Ibid*.)  In contrast, the doctrine of strict liability is ordinarily inapplicable to transactions "whose primary objective is obtaining services," and to transactions in which the "service aspect predominates and any product sale is merely incidental to the provision of the service."  (*Ibid*.) Thus, "[i]n a given transaction involving both products and services, liability will often depend upon the defendant's role."  (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 258.)

These principles are reflected in section 402A of the Restatement Second of Torts (section 402A), which provides that strict liability may be imposed on a seller of a defective product "if [¶] (a) if the seller is engaged in the business of selling such a product, and [¶] (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."  (Rest.2d Torts, § 402A, subd. (1), p. 348.)  Under section 402A, that rule is applicable even though "the user or consumer has not bought the product from or entered into any contractual relation with the seller."  (Rest.2d Torts, § 402A, subd. (2), p. 348.) Nonetheless, "occasional" sellers of products are not subject to the rule.  (Rest.2d Torts, § 402A, com. (f), p. 350.)  Comment (f) to section 402A states:  "The rule . . . appl[ies] to any person engaged in the business of selling products for use or consumption. . . .  It is not necessary that the seller be engaged solely in the business of selling such products. . . . [¶] The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business."  (Rest.2d Torts, § 402A, com. (f), p. 350.)

These principles also are reflected in section 19, subdivision (b), of the Restatement Third of Torts, which provides that "[s]ervices, even when provided

11

commercially, are not products." Comment (f) to that section explains: "[A]part from the sale of a product incidental to the service, one who agrees for a monetary fee to mow the lawn of another is the provider of a service even if the provider is a large firm engaged commercially in lawn care. Moreover, it is irrelevant that the service provided relates directly to products commercially distributed. For example, one who contracts to inspect, repair, and maintain machinery owned and operated by another is the provider of a product-related service rather than the provider of a product." (Rest.3d Torts, § 19 com. (f), p. 271.)

Under these principles, when injury arises from a component integrated in another product, the imposition of strict liability on a party hinges on its role in the relevant transaction. Generally, manufacturers and suppliers of a component to be integrated into a final product may be subject to strict liability when the component itself causes harm. In *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477-481 (*Jimenez*), two window manufacturers supplied windows for mass-produced homes in housing developments. (*Id*. at pp. 476-477, 479.) The trial court granted their motion for summary adjudication on strict liability claims based on defects in the windows. Our Supreme Court reversed, stating that "[f]or purposes of strict products liability, there are 'no meaningful distinctions' between, on the one hand, component manufacturers and suppliers and, on the other hand, manufacturers and distributors of complete products . . . ." (*Id*. at pp. 479-480, quoting *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 (*Kriegler*).)

In contrast, parties involved in passing a defective component to the ultimate user or consumer are not subject to strict products liability when their sole contribution to the pertinent transaction was a service, namely, the installation of the component into the pertinent final product. (*Pierson*, *supra*, 216 Cal.App.3d at p. 345 [discussing cases].) In *Endicott v. Nissan Motor Corp.* (1977) 73 Cal.App.3d 917, 925-926, an automobile manufacturer hired an independent

12

contractor to install seat belts in the cars it sold in California. The manufacturer supplied the disassembled seat belts to the independent contractor, which attached them pursuant to the manufacturer's directions. (*Ibid*.) The appellate court held that the independent contractor was not subject to strict liability for injuries due to defects in the seat belts, concluding that it was "a mere provider of services . . . ." (*Id*. at p. 930.)

The propriety of imposing strict liability on a party that both supplies and installs a defective component hinges on the circumstances of the transaction. In *Barth v. B . F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 233-234 (*Barth*), a tire dealer that supplied and installed a defective tire was determined be a "seller" of the tire, for purposes of section 402A, even though the dealer received no direct payment from the tire's consumer. There, a large manufacturer and distributor of floor maintenance equipment leased a fleet of cars and made arrangements on a national basis for a tire manufacturer to supply replacement tires for the cars. The tire manufacturer's national fleet accounts of that type were serviced by its authorized dealers. (*Barth, supra,* 265 Cal.App.2d at p. 249.) In connection with those accounts, the tire manufacturer's dealership agreements provided that when a dealer took a replacement tire from its inventory and installed it, the dealer was entitled to a credit for the value of the tire -- the amount of which was determined by the manufacturer -- and an installation fee. (*Id*. at p. 249 & fn. 8.) The dealer received the credit and installation fee from the tire manufacturer, rather than the client of the national fleet account. (*Ibid.*)

When an employee of the floor maintenance equipment company suffered injuries from an accident due to a defective replacement tire, he asserted a strict liability claim against the dealer that had installed the tire. (*Barth*, *supra*, 265 Cal.App.2d at p. 233.) In reversing a judgment in favor of the dealer, the appellate court rejected the dealer's contention that it was not a seller of the tire within the

13

meaning of section 402A.  In support of that contention, the dealer had argued that the underlying transaction was "analogous to [one] where [it] merely installed a tire ordered by a customer from another retailer or wholesaler" because it had installed the tire for a minor fee and realized no profit on the transaction.  (*Id*. at pp. 251-252.)  The court concluded that the dealer was "[c]learly" part of the marketing enterprise for the tire, noting that the dealer benefited from servicing the manufacturer's national accounts (in addition to its wholesale and retail business), that it obtained the tire from its own inventory, that it had received a credit for the tire in addition to the installation fee, and that it had placed its name on the tire's warranty form.  (*Id*. at p. 252, italics deleted.)

In *Monte Vista*, *supra*, 226 Cal.App.3d 1681, the appellate court reached a contrary conclusion regarding the imposition of strict liability on a subcontractor that had supplied and installed a defective product.  There, a developer accepted a tiling firm's bid to install tiles in a residential housing project.  (*Id*. at pp. 1683-1684.)  Pursuant to the terms of the bid, the tiling firm was to install soap dishes and other tile fixtures that it bought in bulk from a building supply company.  (*Ibid*.)  As the bid did not specify a type or brand of soap dish, in fulfilling the contract the tiling firm bought what it characterized as "'generic'" soap dishes.  (*Id*. at p. 1684.)  To obtain payment for work performed, the tiling firm submitted invoices that did not set out separate charges for material or fixtures.  (*Ibid*.)

After a purchaser of one of the homes was injured when a soap dish broke, she asserted a strict liability claim against the tiling firm; the court granted summary adjudication on the claim.  (*Monte Vista*, *supra*, 226 Cal.App.3d at p. 1684.)  The appellate court affirmed, concluding that the tiling firm was not a "seller" of the soap dishes for purposes of section 402A.  (*Monte Vista*, *supra*, at pp. 1687-1688.)  The court stated:  "[The tiling firm] was not in the business of selling soap dishes or any other fixtures.  It purchased the soap dish that injured

plaintiff, as well as other fixtures, in order to complete its subcontract . . . . Obviously, it mattered not to [the tiling firm] whether [the developer] or someone else supplied the tile fixtures. [The tiling firm's] job was to do the tile work." (*Id.* at p. 1687.)

### 3. *Evidence*

We turn to the Hernandezcuevas' evidence regarding E. F. Brady's role in the transaction concerning the pertinent asbestos-containing products, namely, Kaiser drywall and Hamilton joint compound. According to Lombardo, who testified on behalf of E. F. Brady, in the late 1960's, E. F. Brady began performing work on "heavy commercial" projects such as high-rise office buildings and major shopping malls. By the mid-1970's, E. F. Brady's contract for the Fluor project, valued at more than $2,000,000, was "a common job" for E. F. Brady. As E. F. Brady's operations manager at the time, Lombardo was responsible for the principal aspects of the Fluor project.

E. F. Brady's bids for work -- including its bid regarding the Fluor project -- always encompassed the materials necessary for the project. Lombardo stated: "You couldn't get a job unless . . . your bid included labor and material." Generally, 75 percent of the amount of a bid -- which became the contract, if accepted -- was allocated to labor, and the remaining 25 percent was allocated to materials. E.F. Brady's profits arose from the provision of labor. In determining the amount of the bid reflecting the provision of materials, E. F. Brady ordinarily included the costs of the materials it bought, including the sales tax, plus a one or two percent markup to cover "escalation of the costs of the materials."

E. F. Brady's selection of materials was regulated by the architect's specifications. Ordinarily, those specifications required the use of a particular brand of drywall or the "equal." In accordance with a common industry practice,

15

when E. F. Brady used a manufacturer's drywall, it also elected to use that manufacturer's joint compound in order to avoid issues regarding the applicable warranties. An exception to that practice involved Hamilton joint compound, which most drywall manufacturers approved for use with their products.

During the mid-1970's, E. F. Brady did not buy products directly from manufacturers, but ordered them through supply houses. Although E. F. Brady ordinarily preferred to use drywall made by U.S. Gypsum, it used Kaiser drywall when necessary. E. F. Brady generally obtained Kaiser products from Expo or another supplier. The supplier was responsible for delivering the ordered products to the job site.

In the case of the Fluor project, E. F. Brady used Kaiser drywall, and thus initially selected Kaiser joint compound.

Shortly after E. F. Brady began installing drywall at the Fluor construction site, it discovered that Kaiser joint compound was not performing properly. E. F. Brady contacted Kaiser, which sent a representative to the job site for a meeting with Lombardo. Also present at the meeting was a Hamilton representative with whom E. F. Brady had a lengthy relationship. The Kaiser representative acknowledged that the Kaiser joint compound was ineffective, and recommended that E. F. Brady use Hamilton joint compound. E. F. Brady accepted the recommendation, and secured the architect's and the general contractor's approval of the change.

### 4. *Analysis*

Because E. F. Brady supplied and installed asbestos-containing products, our inquiry requires a fact-sensitive examination into whether the "service aspect predominate[d] and any product sale [was] merely incidental to the provision of the service." (*Pierson*, 216 Cal.App.3d at p. 344.) We assess E. F. Brady's role in

16

providing the products in light of the policy considerations underlying the imposition of strict liability, namely, whether E. F. Brady was in a position to enhance product safety or exert pressure on the manufacturer to promote that end, and bear the costs of compensating for injuries. (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773; *Barth*, *supra*, 265 Cal.App.2d at p. 253.) As explained below, we conclude the trial court erred in granting nonsuit on the Hernandezcuevas' strict liability claim.

In view of the evidence concerning E. F. Brady's practices in submitting bids, a jury could reasonably find that E. F. Brady was more than an "occasional seller" of drywall and joint compounds (Rest.2d Torts, § 402A, com. (f), p. 350) whose provision of those products was merely incidental to its services (*Pierson*, 216 Cal.App.3d at p. 344). Like the dealer in *Barth*, E. F. Brady derived a considerable benefit from supplying the products, as that was essential to obtaining its subcontracting work. During the mid-1970's, E. F. Brady was a large drywall installation firm whose relevant contracts *always* involved the provision of drywall and related materials. Indeed, Lombardo stated that E. F. Brady could not have secured work without offering to provide the requisite materials and including the costs of those materials in its bids.

E. F. Brady's role in the stream of commerce relating to the products was significant in other respects. As in *Barth*, E. F. Brady's contract for the Fluor project was structured to recoup or defray the costs of the materials -- without necessarily ensuring a profit regarding those costs -- while providing for payment for the installation services. For E. F. Brady, however, those costs were substantial, as they ordinarily constituted 25 percent of the amount of a bid. Accordingly, in the case of E. F. Brady's $2,024,272 Fluor project contract, the costs of the materials passed through to Fluor approximated $500,000. Furthermore, although E. F. Brady had no dealership contract with Kaiser and

17

Hamilton, E. F. Brady used their products when necessary to fulfill its contracts. That ongoing relationship was sufficient to command the personal attention of Kaiser's and Hamilton's representatives to E. F. Brady's concerns regarding the products. Thus, when Kaiser joint compound proved to be ineffective during the Fluor project, those representatives went to the jobsite to address the problem.

Viewed in light of the policies underlying the doctrine of strict liability, the Hernandezcuevas' evidence sufficed to show that E. F. Brady was involved in the stream of commerce relating to the defective products. E. F. Brady was capable of bearing the costs of compensating for injuries due to the products, as it was a subcontractor specializing in heavy commercial projects, made sizeable purchases of the defective products, and always arranged to pass its material costs through to the ultimate user. Moreover, due to E. F. Brady's relationship with Kaiser and Hamilton, it was "'in a position to exert pressure on the manufacturer'" to improve product safety. (*Bay Summit*, *supra*, 51 Cal.App.4th at p. 773.)

*Monte Vista*, upon which E. F. Brady and amici curiae rely, is distinguishable.[4] There, the appellate court declined to impose strict liability on a tiling subcontractor that supplied and installed a defective soap dish because there was no evidence that the subcontractor was a seller of the soap dish under section 402A. In so concluding, the court placed special emphasis on the fact that the evidence showed only that "it mattered not to [the subcontractor] whether [the developer] or someone else supplied the tile fixtures." (*Monte Vista*, *supra*, 226 Cal.App.3d at p. 1687.) That is not the case here. As explained above, the Hernandezcuevas' evidence showed that E. F. Brady always provided materials in

---

[4] We granted requests from the Coalition for Litigation Justice, Inc., American Subcontractors Association, The Association of the Wall and Ceiling Industry, and the Roofing Contractors Association of California to submit briefs as amici curiae.

fulfilling its contracts. Lombardo stated: "You couldn't get a job unless . . . your bid included labor and material." Moreover, when one of those materials proved unsatisfactory, E. F. Brady summoned assistance from the pertinent manufacturers and secured approval to use another product. E. F. Brady's substantial purchases of the defective products, coupled with its ongoing relationships with their manufacturers, thus support the imposition of strict liability.[5]

---

[5]     The other decisions upon which E. F. Brady and amici curiae rely are distinguishable or otherwise inapposite. In most of those cases, the reviewing court determined that imposition of strict liability was unwarranted because the defendant was not a seller of the defective product, or was primarily engaged in providing a service, although that service involved a defective product. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1188-1189 [hotel not liable for injuries arising from defective bathtub in room]; *Ontiveros v. 24 Hour Fitness USA, Inc.* (2008) 169 Cal.App.4th 424, 426-435 [fitness club not liable for injuries arising from defective exercise machine]; *Hector v. Cedars-Sinai Medical Center* (1986) 180 Cal.App.3d 493, 502-503 [hospital not liable for ordering defective pacemaker at physician's request and providing surgery room, technical services, and medical care related to its implantation]; *Silverhart v. Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027-1029 [hospital not liable for injuries due to broken surgical needle hospital bought for use in surgical procedures].) As explained above, E. F. Brady's role in providing the defective products was not merely incidental to its services.

In one of the cases, our Supreme Court declined to impose strict liability for defective drugs on pharmacies, even though they sell drugs and provide related professional services, because the statutory scheme regulating pharmacies shields them from such liability. (*Murphy v. E. R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 679-681.) No analogous statutory scheme applies here.

The remaining decisions involve doctrines not related to the issues presented. E. F. Brady and amici curiae purport to find support from *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 342-347, in which the family of a deceased U.S. Navy seaman asserted claims for negligence and strict liability against manufacturers of pumps and valves used on warships, alleging that the serviceman's exposure to asbestos dust from asbestos-containing materials used in connection with the pumps and valves caused his fatal mesothelioma. (*Ibid*.) The
*(Fn. continued on next page.)*

19

E. F. Brady and amici curiae contend that E. F. Brady was the "end user" -- not the seller -- of the defective products used in the Fluor project, arguing that E. F. Brady paid sales tax in buying the products from Expo. We disagree. The drywall and joint compound, after installation, passed into the possession of Fluor, which paid for the project. Furthermore, as explained above (see pt. A.2., *ante*), the imposition of strict liability hinges on a party's "participatory connection" to the stream of commerce regarding the defective product, rather than the party's "precise legal relationship" to members of that stream. (*Kasel*, *supra*, 24 Cal.App.3d at p. 725.) Thus, a party that buys a defective product and leases it to others, or offers its use for payment, may be subject to strict liability for injuries arising from product's defect. (See *McClaflin v. Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446, 452-453 [equipment lessor properly subject to strict liability for defective rented tool]; *Garcia*, *supra*, 3 Cal.App.3d at pp. 326-327 [owner of launderette properly subject to strict liability for defective coin-operated washing machines].) Accordingly, the party's payment of sales tax in buying the product to be leased or offered for use cannot be regarded as precluding the imposition of strict liability. We see no basis for rejecting the imposition of strict liability here, as E. F. Brady's bid regarding the Fluor project included the amount

---

court rejected the claims, concluding that "a product manufacturer may not be held liable in strict liability or negligence for harm caused by another manufacturer's product unless the defendant's own product contributed substantially to the harm, or the defendant participated substantially in creating a harmful combined use of the products." (*Id*. at p. 342.) Here, E. F. Brady provided the defective drywall and joint compound, rather than some other product used in connection with them.

Amicus curiae Coalition for Litigation Justice, Inc., also argues that *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 66, supports its claim that a plaintiff's status as a "sophisticated user" of product shields the products' supplier from liability. However, the record contains no evidence that Joel Hernandezcueva constituted a sophisticated user of the defective products at issue here.

of sales tax it expected to pay, and thus effectively passed on the payment of that tax to Fluor.[6]

Pointing to *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131 (*La Jolla Village*), amici curiae contend that considerations of public policy dictate that subcontractors involved in construction projects should not be subject to strict liability when they provide products complying with the architect's specifications. There, the appellate court rejected the imposition of strict liability on subcontractors for defects in a residential housing project. (*Id*. at pp. 1144-1149). Noting that subcontractors generally work under the supervision of the general contractor, have little control over the project's specifications, and are usually less well capitalized and insured than the developer, the court

---

[6]     In a related contention, amici curiae contend that E. F. Brady is not subject to strict liability because the Fluor complex is a commercial building, not a mass-produced home. They argue that only certain participants in the construction of mass-produced homes have been determined to be subject to strict liability, namely, developers of such homes (*Kriegler*, *supra*, 269 Cal.App.2d at p. 227) and manufacturers of windows that are a component of the homes (*Jimenez*, *supra*, 29 Cal.4th at pp. 477-479). However, the imposition of strict liability on E. F. Brady arises from its role as a supplier of mass-produced products, not from the work it performed in installing those products in the Fluor complex. As noted above (see pt. A.2., *ante*), in *Jimenez*, our Supreme Court stated that for purposes of the imposition of strict liability, there are no meaningful distinctions between, on the one hand, component manufacturers and suppliers and, on the other hand, manufacturers and distributors of complete products. (*Id*. at pp. 479-480.) That rationale applies here, as there are no meaningful distinctions between E. F. Brady's conduct as supplier of the mass-produced drywall and joint compound and the dealer's conduct as supplier of the mass-produced tires in *Barth*. (See also *Peterson v. Superior Court*, *supra*, 10 Cal.4th at p. 1210 [tenants and guests of a commercial building injured by a defective product installed in it may assert any available strict liability claim against the manufacturer, distributors, and retailers of the product.])

21

concluded subcontractors are properly immune from strict liability "regardless of whether they provided 'services' or a 'product.'" (*Id*. at pp. 1144-1148.)

We decline to follow *La Jolla Village*, as the broad per se immunity it proposes is inconsistent with existing law, which predicates the imposition of strict liability on a party's "participatory connection" -- rather than its "precise legal relationship" -- to the stream of commerce. (*Kasel*, *supra*, 24 Cal.App.3d at p. 725.) That principle dictates a fact-sensitive inquiry into the party's activities relating to the defective product, with due attention to the policies underlying the doctrine of strict liability. As explained above, the circumstances surrounding E. F. Brady's provision of the defective products are materially similar to those surrounding the dealer in *Barth*, which provided the defective tire in accordance with its dealership agreement with the tire manufacturer.

We find additional support for our conclusion from *Jimenez*, in which our Supreme Court criticized the broad immunity proposed in *La Jolla Village*. Although the issues before the court concerned the imposition of strict liability on the manufacturers of defective windows used in mass-produced homes, the court examined the then-existing case authority regarding the imposition of strict liability on subcontractors, including *La Jolla Village*. (*Jimenez*, *supra*, 29 Cal.4th at pp. 477-479.) The Supreme Court observed that later decisions had rejected the broad immunity proposed in *La Jolla Village*, including the Court of Appeal in the underlying case, which also decided *La Jolla Village*. The Supreme Court noted with apparent approval that the underlying Court of Appeal had concluded that strict liability may be imposed on subcontractors providing products in mass-produced homes, subject to "the limitation, consistent with *established law*, that persons providing only services are not subject to strict products liability." (*Id*. at p. 479, italics added.) The Supreme Court also disapproved *La Jolla Village* to the

22

extent it was inconsistent with the imposition of strict liability on manufacturers of components installed in mass-produced homes.  (*Id*. at p. 481, fn. 1.)[7]

Amicus curiae Coalition for Litigation Justice, Inc., also contends that considerations of public policy preclude the imposition of strict liability on E. F. Brady, arguing that there is an alternative source of compensation potentially available to the Hernandezcuevas, namely, the asbestos bankruptcy trust system created pursuant to federal bankruptcy law (11 U.S.C. § 524(g)).  According to amicus curiae, the system includes trusts established by approximately 100 companies, including virtually all of  the major asbestos product manufacturers, and operates to compensate plaintiffs claiming injuries due to exposure to asbestos. However, the contention fails under the collateral source rule, which bars a defendant from shielding itself from liability for injuries by identifying a source of compensation for the plaintiff that is wholly independent of the defendant. (*Anheuser-Busch, Inc. v. Starley* (1946) 28 Cal.2d 347, 349; *McKinney v. California Portland Cement Co*. (2002) 96 Cal.App.4th 1214, 1221-1227.)  The record is devoid of evidence that the Hernandezcuevas may receive compensation from any bankruptcy trust related to E. F. Brady.  Accordingly, we reject the contention.  In sum, the trial court erred in granting nonsuit on the Hernandezcuevas' claim for strict products liability.[8]

---

[7]     Although the Supreme Court's discussion of *La Jolla Village* relating to subcontractors is dicta, that does not mean the discussion is "wrong, unreasonable, or should not be followed."  (*Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1045.)  A dictum of the Supreme Court "while not controlling authority, carries persuasive weight and should be followed where it demonstrates a thorough analysis of the issue or reflects compelling logic.  [Citations.]"  (*Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297.)

[8]     E. F. Brady contends the grant of nonsuit is properly affirmed on another ground, namely, that it was not named as a defendant with respect to the strict
*(Fn. continued on next page.)*

23

B.  *Motion for a New Trial*

Appellant contends the trial court erred in denying the Hernandezcuevas'

motion for a new trial, predicated on allegations of judicial misconduct.  As

explained below, we disagree.

---

liability claim, as pleaded in the Hernandezcuevas' first amended complaint.  For
the reasons discussed below, E. F. Brady has forfeited any contention of error
predicated on that defect.

Generally, when a complaint's allegations are ambiguous or uncertain, a
defendant must raise the defect by demurrer.  (*Stockton Newpapers, Inc. v.
Redevelopment Agency* (1985) 171 Cal.App.3d 95, 104.)   Failure to do so works a
forfeiture of contentions based on the defect.  (*Ibid*.)  For that reason, such
contentions may not be raised for the first time on appeal.  (*Fenton v. Groveland
Community Services Dist.* (1982) 135 Cal.App.3d 797, 810, disapproved on
another ground in *Katzberg v. Regents of University of California* (2002) 29
Cal.4th 300, 328, fn. 30.)

Here, the preliminary allegations of the Hernandezcuevas' original
complaint identified a group of "manufacturing defendants," including Does 1
through 299.  Although the caption of the strict liability claim states that it is
asserted against that group of defendants, the claim's underlying allegations
identify the pertinent defendants as those listed on Exhibit "B," which contains no
reference to any Doe defendants.  After amending the original complaint to
identify E. F. Brady as "Doe-14," the Hernandezcuevas filed a materially similar
first amended complaint.

The record reflects no demurrer by E. F. Brady based on uncertainty
regarding its status as a defendant with respect to the strict liability claim.  Instead,
E. F. Brady answered the first amended complaint, and later filed its motion for
partial nonsuit, which encompassed the strict liability claim.  In the section of that
motion entitled "Procedural History," E. F. Brady noted a potential deficiency in
the first amended complaint distinct from the defect it asserts on appeal, but stated:
"E. F. Brady makes this motion as though it is a generally named defendant."
Because E. F. Brady first raised the pertinent pleading defect on appeal, its
contention has been forfeited.

### 1. *Governing Principles*

A new trial may be granted for an "irregularity in the proceedings of the court, jury or adverse party . . . by which either party was prevented from having a fair trial." (Code Civ. Proc. § 657, subd. (1).) Included within that provision "is an overt act of the judge which prevents the complaining party from having a fair and impartial trial. [Citation.] Such irregularity must be shown by affidavits presented in conjunction with a motion for new trial. [Citations.] On such motion the determination is made with reference to the course of conduct alleged to constitute an irregularity violative of a right to a fair and impartial trial[,] and it is immaterial whether or not the irregularity resulted from bias or prejudice. [Citation.]" (*Develop-Amatic Engineering v. Republic Mortgage Co.* (1970) 12 Cal.App.3d 143, 150-151.)

"In conducting trials, judges "'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other." [Citation.]' [Citation.] Their conduct must ""'accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality[.]'"" [Citation.] ""'The trial of a case should not only be fair in fact, . . . it should also appear to be fair.'" [Citation.]" (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1002 (*Haluck*).)

Generally, when irregularity of proceedings is relied upon as a ground for a new trial, the movant must demonstrate a timely objection to the purported irregularity, "since it is settled that a party may not remain quiet, taking his chances upon a favorable verdict, and, after a verdict against him, raise a point of which he knew and could have raised during the progress of the trial. [Citations.]" (*Cembrook v. Sterling Drug, Inc.* (1964) 231 Cal.App.2d 52, 67.) A party may

25

forfeit a contention of judicial misconduct by failing to raise a prompt objection, absent a showing that doing so would have been fruitless. (*Estate of Golden* (1935) 4 Cal.2d 300, 311; see *Schrader Iron Works, Inc. v. Lee* (1972) 26 Cal.App.3d 621, 641.) The purpose of the rule is to permit the trial court an opportunity to take curative action. (*Estate of Golden*, *supra*, 4 Cal.2d at p. 311.)

The trial court's ruling on a new trial motion is reviewed for an abuse of discretion. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.) To the extent that the trial court confronted conflicting declarations in denying the new trial motion, we affirm its factual determinations, whether express or implied, if supported by substantial evidence. (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507-508 & fn. 3; *DeWit v. Glazier* (1957) 149 Cal.App.2d 75, 82.) Nonetheless, to the extent the record establishes an error during the trial, we "review[] the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial." (*City of Los Angeles v. Decker*, *supra*, 18 Cal.3d at pp. 871-872.)

### 2. *Underlying Proceedings*

The Hernandezcuevas' new trial motion contended that Judge Joseph Di Loreto, who conducted the trial, engaged in misconduct in open court by reading newspapers and magazines, sorting through mail, engaging in weight training, and -- on one occasion -- falling asleep. The Hernandezcuevas requested a new trial before a different judge. Supporting the new trial motion were declarations from their counsel, together with declarations from expert witness Dr. Reginald Abraham and a juror.

Counsel stated that on a daily basis, Judge Di Loreto entered the courtroom carrying newspapers, magazines, and mail, which he read in the view of the jury while seated at the bench during the proceedings. On several occasions, when

26

evidentiary objections were raised, he consulted a monitor and issued what counsel characterized as "'shoot from the hip'" rulings. Counsel also stated that the judge sometimes lifted weights in a manner visible and audible to the jurors, and on one occasion, appeared to be asleep, as his eyes were closed and he made "sounds . . . associate[d] with sleeping or snoring."

The other declarations contained similar accounts of Judge Di Loreto's activities on the bench. Dr. Abraham stated that during his testimony, he was able to view the judge closely from the witness chair. According to Abrahams, he saw the judge reading newspapers and racing magazines, and holding a weight. The juror stated that she observed the judge reading newspapers and lifting weights, and viewed his conduct as suggesting that the trial was of little or no importance.

E. F. Brady's opposition to the new trial motion maintained that the Hernandezcuevas' contentions of judicial misconduct failed for want of timely objections, and that they had shown no misconduct warranting a new trial. E. F. Brady submitted a declaration from its counsel, stating that Judge Di Loreto had conducted the trial in an impartial and professional manner. Counsel never observed the judge lifting weights, and heard no "sounds associated with sleeping or snoring." Counsel further stated that even if the judge had engaged in other court business while on the bench, he gave what appeared to be informed evidentiary rulings after consulting the testimony displayed on a court monitor. E. F. Brady also submitted declarations from three jurors, who stated that Judge Di Loreto engaged in no unprofessional conduct, and did nothing that impaired their ability to discharge their duties.

In denying the new trial motion, Judge Di Loreto denied that he fell asleep during the trial. He acknowledged that during the 17-day trial, he engaged in "multi-tasking," including looking at legal newspapers and reviewing petitions in unrelated cases, but stated that those activities were essential to his work, and that

27

he attended to the trial while trying to conceal them from the jury. He further stated that following back surgery in 2001, he was obliged to strengthen his back. To support his back during long trials, he purchased a special chair for use on the bench, and to relieve back pressure, he occasionally placed a weight on his knee and lifted it a few inches. He characterized that activity as "a reasonable accommodation for [his] somewhat minor disability." According to the judge, his exercises were done below the level of the bench, outside the jurors' view.

### 3. *Analysis*

We conclude that the Hernandezcuevas failed to establish judicial misconduct sufficient to warrant a new trial. As the court's conduct during trial must satisfy """""recognized principles of judicial decorum""""" (*Haluck*, *supra*, 151 Cal.App.4th at p. 1002), we do not condone the activities in which the judge allegedly engaged. However, the Hernandezcuevas' counsel raised no objection to those alleged activities during the trial. Absent an adequate explanation why objections would have been futile, the contentions of judicial misconduct have been forfeited. Appellant has failed to provide such explanation.

In an effort to avoid application of the forfeiture rule, appellant directs our attention to *DiMonte v. Neumann Med. Ctr.* (Pa. 2000) 751 A.2d 205, 207-210 (*DiMonte*), *Haluck*, *supra,* 151 Cal.App.4th 994, and *People v. Sturm* (2006) 37 Cal.4th 1218 (*Sturm*). In *DiMonte*, the appellant challenged the denial of her post-trial motions, contending the judge who conducted the trial engaged in many instances of misconduct. (*DiMonte, supra,* 751 A.2d at pp. 207-210.) The declarations supporting those motions stated that the judge had openly engaged in business and personal phone calls during testimony, left the courtroom during closing arguments, and singled out certain jurors for praise. (*Ibid.*) The Pennsylvania Supreme Court concluded that the appellant's failure to object to the

conduct did not work a forfeiture because the record showed that doing so "would [have] required counsel to directly challenge the authority of the court by suggesting that the judge [was] deficient in his duties." (*Id*. at p. 209.) In so concluding, the court placed special emphasis on the fact that the judge, in denying the post-trial motions, characterized them as a personal attack on him. (*Id*. at p. 210.) The court thus remanded the matter for an evidentiary hearing regarding allegations of judicial misconduct. (*Id*. at p. 212.)

In *Haluck*, during the course of the trial, the judge engaged in ex parte communications with defense counsel, overruled the plaintiffs' evidentiary objections by holding up an "overruled" sign that defense counsel had given the judge, and repeatedly engaged in jokes at the expense of plaintiffs' counsel. (*Haluck*, *supra*, 151 Cal.App.4th at pp. 997-1001.) The trial resulted in a judgment favorable to the defendant. (*Id*. at p. 998.) Reversing the judgment on the basis of judicial misconduct, the appellate court rejected a contention that the plaintiffs had forfeited their claims of judicial misconduct by failing to assert timely objections, concluding that the "atmosphere of this trial" rendered such objections futile. (*Id*. at p. 1007.)

In *Sturm*, the trial judge repeatedly belittled crucial defense witnesses and defense counsel. (*Sturm*, *supra*, 37 Cal.4th at pp. 1233-1237.) Our Supreme Court concluded that the defendant's failure to raise timely objections to some incidents of misconduct did not work a forfeiture, as the "evident hostility" between the trial judge and defense counsel rendered it reasonable for counsel to avoid provoking the judge. (*Id*. at p. 1237.)

Here, in contrast to *DiMonte*, *Haluck*, and *Sturm*, the record discloses no evidence that Judge Di Loreto would have regarded timely objections to the alleged misconduct as direct challenges to his authority, or that they would have been futile. The misconduct alleged against the judge is less egregious than that

29

asserted in those cases, and unlike *DiMonte* and *Sturm*, Judge Di Loreto manifested no clear indication of personal animus toward the Hernandezcuevas or their counsel. In denying the motion, Judge Di Loreto firmly denied that he fell asleep during the trial, but expressly refrained from characterizing that allegation in prejorative terms. Furthermore, while acknowledging some "multi-tasking" and weight lifting, he emphasized his commitment to attending to the trial and shielding those activities from the jury. Nothing before us establishes that he would have failed to take appropriate curative action in response to a timely objection.

Moreover, had we found no forfeiture, we would find no error in the denial of the new trial motion, as appellant has shown no prejudice from the judge's acknowledged "multi-tasking" and weight lifting. The record discloses evidence sufficient to support Judge Di Loreto's findings regarding his activities.[9] Assuming -- without deciding -- that some or all of those activities were improper, the record discloses no resulting prejudice. The transcript of the trial shows no lack of attention or bias by Judge Di Loreto. Although the new trial motion contended that he made "shoot from the hip" evidentiary rulings, appellant assigns no error to any evidentiary ruling made by the judge, and our own independent review of the record reveals none. Furthermore, even the juror whose declaration contained a negative assessment of the judge's activities was demonstrably not influenced in a manner unfavorable to the Hernandezcuevas, as the record shows the juror voted in support of their negligence claim.

---

[9]    In rendering those findings, Judge Di Loreto was authorized to consider the declarations filed in connection with the motion and his own recollection of the proceedings at trial. (8 Witkin, Cal. Procedure (5th ed. 2008) Attack on Judgment in Trial Court, § 68, pp. 653-655; Code Civ. Proc., § 660.)

Pointing to *Haluck*, appellant suggests she is not obliged to show prejudice from Judge Di Loreto's acknowledged conduct. There, the appellate court concluded that the plaintiff claiming judicial misconduct was not obliged to prove harm. (*Haluck*, *supra*, 151 Cal.App.4th at p.1001.) Quoting *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 461 (*Hernandez*), the court stated: "'Where, as here, the appearance of judicial bias and unfairness colors the entire record, we depart from the general rule requiring plaintiff to make an affirmative showing of prejudice. The test is not whether plaintiff has proved harm, but whether the court's comments would cause a reasonable person to doubt the impartiality of the judge or would cause us to lack confidence in the fairness of the proceedings such as would necessitate reversal. The record here inspires no confidence in either case.'" (*Haluck*, *supra*, 151 Cal.App.4th at p. 1008.) Furthermore, relying on *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 247 (*Catchpole*), the court concluded that even absent a showing of actual judicial bias, the matter was properly remanded for further proceedings before a new judge. (*Haluck*, *supra*, 151 Cal.App.4th at p. 1009.)

We see no basis to relieve appellant of the requirement that prejudice be shown. The continuing vitality of *Hernandez* and *Catchpole* is suspect, as our Supreme Court disapproved both cases to the extent they suggested that due process may be violated merely by the appearance of judicial bias. (*People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4.) Furthermore, the exception they identified to the requirement of a showing of prejudice is inapplicable here, as the record discloses no "'appearance of judicial bias and unfairness.'" (*Haluck*, *supra*, 151 Cal.App.4th at p. 1008.) In sum, appellant has failed to establish error in the denial of the new trial motion.

31

## DISPOSITION

The judgment is reversed solely with respect to appellant's claim for strict products liability against respondent, and affirmed in all other respects.  The matter is remanded for further proceedings in accordance with this opinion.  Appellant is awarded her costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


MANELLA, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.