[No. F052419. Fifth Dist. Nov. 3, 2008.]

GUILLERMO ARRIAGA, Plaintiff and Appellant, v.
CITICAPITAL COMMERCIAL CORPORATION, Defendant and
Respondent.

1530

## COUNSEL

Law Office of Jacob M. Weisberg and Jacob M. Weisberg for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Daniel G. Bath, Caroline E. Chan and Lynda J. Kim for Defendant and Respondent.

## OPINION

**LEVY, Acting P. J.**—Appellant, Guillermo Arriaga, was injured when his finger became entangled in a glue spreading machine. This machine was in used condition when purchased by Arriaga's employer, Orepak Hardwood Products, Inc. (Orepak). The accident occurred because a guard was removed from the glue spreader before Orepak took possession.

Respondent, CitiCapital Commercial Corporation (CitiCapital), is the successor in interest to JLA Credit Corporation (JLA). JLA financed the purchase of the glue spreader through a finance lease for AVP, Ltd. (AVP). As a lessor under a finance lease, JLA did not select, manufacture or supply the machine but, rather, purchased it for, and then rented it to, AVP. Orepak acquired the glue spreader from AVP.

Arriaga filed the underlying complaint for personal injury alleging causes of action for strict liability, negligence, and breach of warranty. Arriaga named the manufacturer, retailer, and lessee of the glue spreader as defendants. CitiCapital was also included as the purported owner/lessor of the machine.

CitiCapital moved for summary judgment on the ground that, as a finance lessor and one-time seller of the glue spreader, it was not part of the chain of commerce and thus not subject to strict products liability. CitiCapital further

asserted that it had no duty to inspect the machine for defects before the machine was purchased by Orepak and thus could not be held liable for negligence. Similarly, CitiCapital argued that, in its role as a finance lessor, it could not be held liable for breach of implied warranty.

The trial court granted CitiCapital's motion. The court concluded strict liability was inapplicable because CitiCapital neither manufactured nor assembled the glue spreader. Further, assuming CitiCapital was a seller, and not merely a financing company, the court held that CitiCapital could not be held strictly liable because the tort does not apply to a seller of a used good who has not rebuilt or reconditioned the product. Regarding the negligence claim, the court determined that, again assuming that a financing company is deemed the seller of a used good, CitiCapital had no duty to inspect or test the product for defects prior to its sale. Similarly, under these circumstances, no implied warranties applied.

Arriaga contends that CitiCapital is strictly liable for his injuries because CitiCapital was instrumental in placing the product into the stream of commerce. For this reason, Arriaga argues, CitiCapital is not a seller of used equipment so as to exempt it from the application of strict product liability. Arriaga further asserts that as the owner/lessor of the machine, CitiCapital was required to exercise reasonable care to inspect the machine before turning it over to the lessee. Finally, Arriaga argues that, if the machine was sold at all by CitiCapital, it was sold to Orepak directly and an implied warranty of merchantability arose.

As discussed below, summary judgment was properly granted. CitiCapital was a finance lessor, not a commercial lessor. As the entity that merely provided the financing, CitiCapital was outside the direct chain of distribution. Accordingly, strict liability as a lessor is inapplicable. Further, if CitiCapital is considered to be the seller of the machine, it sold a used product that it had no connection to other than having obtained bare legal title through the financing mechanism. Thus, CitiCapital cannot be held liable under either strict products liability or negligence theories. Therefore, the judgment will be affirmed.

## BACKGROUND

AVP executed a lease agreement with JLA to acquire a glue spreading and coating machine. The lease provided that JLA, the lessor, was not a dealer or manufacturer of the machine and that the machine was of a size, design, capacity, description and manufacture selected by AVP, the lessee. Klor Machinery, Inc. (Klor), was designated in the lease as the supplier of the

equipment. JLA and AVP expressly agreed that the lease was a "finance lease" as defined by California Uniform Commercial Code section 10103, subdivision (a)(7).

In the lease, JLA disclaimed any warranties including liability to AVP or any third party for "consequential, incidental, special or exemplary damages arising out of or related to the transaction contemplated hereunder, whether in action based on contract, tort (including negligence or strict liability) or any other legal theory . . . ."

The lease required AVP to maintain the equipment in good operating condition, repair and appearance and to protect it from deterioration other than normal wear and tear. Further, AVP could not modify the machine absent JLA's prior written consent and JLA had the right to inspect the machine at any time. At the end of the lease term, AVP had the option to purchase the machine "as is" for $101.

Two days after the lease was executed, JLA ordered the machine specified in the lease from Klor. Black Bros. Co., the manufacturer of the glue spreading machine, had sold the machine to Klor and Klor in turn sold the machine to JLA. JLA took title to the machine, paid for it, and leased it to AVP. However, Klor shipped the machine directly to AVP.

AVP used the machine for approximately five years. During that period, AVP modified the machine by removing one corner of a safety guard.

Near the end of the lease term, AVP entered into an agreement to sell certain equipment to Orepak. This sale included the glue spreader that had been leased from JLA. The purchase price for the glue spreader was $17,500, the remaining obligation under the lease. Orepak was to pay this amount directly to CitiCapital, JLA's successor in interest, and Orepak would then own the equipment free and clear of any liens or obligations. Orepak wired this amount to CitiCapital and, pursuant to a bill of sale from AVP, took possession of the machine.

Thereafter, Arriaga, one of Orepak's employees, was injured while using the machine. Arriaga's finger became entangled where a portion of the guard had been removed by AVP. If the guard had been in place, the accident would not have occurred.

## DISCUSSION

1. *Standard of review.*

A defendant who moves for summary judgment under Code of Civil Procedure section 437c must either negate a necessary element of the

plaintiff's cause of action or establish a complete defense to that cause of action. The moving party must demonstrate that a material question of fact requiring examination by the trial court does not exist under any possible hypothesis within the reasonable purview of the allegations of the complaint. If the moving defendant satisfies this obligation, the burden shifts to the plaintiff to produce evidence creating a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (*o*)(2); *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1594 [50 Cal.Rptr.2d 431].)

The trial court properly grants summary judgment where it determines that no triable issue of material fact exists and that the moving party is entitled to judgment as a matter of law. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) The appellate court reviews the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion, except that which the trial court properly excluded, and the uncontradicted inferences the evidence reasonably supports. (*Ibid.*)

## 2. *CitiCapital is not strictly liable in tort.*

### a. *The strict products liability doctrine.*

Under the strict products liability doctrine, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897].) Such liability insures "that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.)

Beyond manufacturers, anyone identifiable as "an integral part of the overall producing and marketing enterprise" is subject to strict liability. (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].) Accordingly, retailers engaged in the business of distributing goods to the public are strictly liable in tort for personal injuries caused by defects in those goods. (*Ibid.*) This works no injustice to the manufacturer and retailer because they can apportion the costs of such protection in the course of their continuing business relationship. Moreover, such strict liability leads to enhanced product safety since retailers are in a position to exert pressure on manufacturers. Finally, by including the retailer as a defendant, the opportunity for an injured consumer to recover is increased. (*Id.* at pp. 262–263.)

Similarly, courts have applied the doctrine to others involved in the vertical distribution of consumer goods. Thus, lessors of personal property, wholesale and retail distributors, and licensors are subject to strict products liability. (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 773 [59 Cal.Rptr.2d 322].) Although not necessarily involved in the manufacture or design of the final product, these defendants were responsible for passing the product down the line to the consumer and are able to bear the cost of compensating for injuries. (*Ibid.*)

Strict liability also applies where a nonmanufacturing party is "outside the vertical chain of distribution" of the product, but plays "an integral role in the 'producing and marketing enterprise' of a defective product and profit[s] from placing the product into the stream of commerce." (*Bay Summit Community Assn. v. Shell Oil Co., supra,* 51 Cal.App.4th at p. 773.) "Imposing strict liability under these circumstances is 'an expression of policy that once an entity is instrumental in placing a defective product . . . into the stream of commerce, then liability [should] attach[] without regard to conduct (fault).' " (*Ibid.*)

Nevertheless, imposition of strict liability based on this stream of commerce or marketing enterprise theory is not limitless. The strict liability doctrine derives from judicially perceived public policy considerations, i.e., enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants. (*Vandermark v. Ford Motor Co., supra,* 61 Cal.2d at pp. 262–263; *Bay Summit Community Assn. v. Shell Oil Co., supra,* 51 Cal.App.4th at p. 774.) Where these policy justifications are not applicable, the courts have refused to hold the defendant strictly liable even if that defendant could technically be viewed as a " 'link in the chain' " in getting the product to the consumer market. (*Bay Summit Community Assn. v. Shell Oil Co., supra,* 51 Cal.App.4th at p. 774.) In other words, the facts must establish a sufficient causative relationship or connection between the defendant and the product so as to satisfy the policies underlying the strict liability doctrine. (*Id.* at p. 776.)

In *Bay Summit Community Assn. v. Shell Oil Co., supra,* 51 Cal.App.4th 762, the court set forth the factors required to establish such a causative relationship or connection. The court concluded that to hold a defendant strictly liable under a marketing/distribution theory, the plaintiff must demonstrate that: "(1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process." (*Id.* at p. 778.)

b. *The parties executed a finance lease.*

■    A finance lease as defined in California Uniform Commercial Code section 10103, subdivision (a)(7), is the product of a three-party transaction. The lessor does not select, manufacture, or supply the goods. Rather, the supplier manufactures or supplies the goods pursuant to the lessee's specifications. As explained in the California comment to this section, "After the prospective finance lease is negotiated, a purchase order, sales agreement, or lease agreement is entered into by the lessor (as buyer or prime lessee) or an existing order, agreement or lease is assigned by the lessee to the lessor, and the lessor and the lessee then enter into a lease or sublease of the goods." (Assem. Com. on Judiciary, rep. on Cal. U. Com. Code (Aug. 15, 1988) 23C West's Ann. Com. Code (2002 ed.) foll. § 10103, p. 339.) The lessor usually performs a limited function and thus the lessee looks almost entirely to the supplier for representations, covenants and warranties. The focus of a finance lease is the transaction, not the status of the parties. (*Ibid.*) Moreover, finance lease status may be achieved by agreement of the parties. (*Ibid.*) The California definition of a finance lease parallels the Uniform Commercial Code.

California courts have not yet considered the distinguishing characteristics of a finance lease and commercial lease but some federal courts and other jurisdictions have. These opinions analyze Uniform Commercial Code finance leases. Since California has also adopted the Uniform Commercial Code definition of finance lease, this court can look to those opinions for guidance.

■    To a substantial extent, the role of a finance lessor may be analogized to the role of a bank that loans money to its clients. (*Rivera v. Mahogony Corp.* (1986) 145 Ill.App.3d 213, 216 [98 Ill.Dec. 538, 494 N.E.2d 660, 662].) However, rather than simply loaning the money for the purchase to the ultimate user of the equipment, the transaction is set up as a "lease," with the lessor "purchasing" the equipment for the specific purpose of "renting" it to the user. (*Ibid.*) Accordingly, the finance lease can be thought of as a "disguised" security agreement, a secured installment sales contract, or a lease " ' "intended as security." ' " (*Nath v. National Equipment Leasing Corp.* (1981) 497 Pa. 126, 130–131 [439 A.2d 633, 635].) Normally, the lessor is unfamiliar with the particular equipment involved. (*Rivera v. Mahogony Corp., supra,* 494 N.E.2d at pp. 662–663.) Further, although this security agreement is written in lease form, the finance lessor does not expect to retake the equipment at the end of the lease period. (*Nath v. National Equipment Leasing Corp., supra,* 439 A.2d at p. 635.) Therefore, the parties generally execute a contemporaneous option whereby the user can purchase title to the equipment from the lessor at the end of the lease period for an amount less than the then expected value of the equipment. (*Rivera v. Mahogony Corp., supra,* 494 N.E.2d at p. 663.)

In contrast, the commercial lease is what is commonly meant by the word "lease." With a commercial lease, the lessor supplies the particular equipment, i.e., selects the product and places it into the stream of commerce. In theory, the lessor allows the lessee to use the equipment for some fraction of its useful life but fully expects to retake the equipment at the end of the lease term and either resell or re-lease it. This right to possession of the equipment upon default or expiration of the lease is known as the "equipment reversion." (*Nath v. National Equipment Leasing Corp., supra*, 439 A.2d at p. 635.)

Here, the lease for the glue spreader was clearly a finance lease. As detailed above, it was a three-party transaction. AVP selected the machine and it was supplied by Klor. JLA ordered the machine after the lease was negotiated and Klor shipped the machine directly to AVP. AVP had the option to purchase the machine at the end of the lease period for the nominal sum of $101. Moreover, the parties to the lease agreed that the transaction was a "finance lease."

    c.   *The policy considerations behind imposing strict products liability on those involved in the vertical distribution of consumer goods are not furthered by including finance lessors.*

Arriaga contends that CitiCapital is strictly liable for his injuries as the original purchaser of the glue spreader that introduced this product into the stream of commerce. According to Arriaga, CitiCapital is an integral part of the overall producing and marketing enterprise that should bear the cost of injuries from this defective product.

Generally, commercial lessors of personal property will be subject to strict liability because, as with manufacturers and retailers, lessors place the article on the market, knowing that it is to be used without inspection for defects. (*Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) Nevertheless, the lessor must be found to be in the business of leasing, in the same general sense as the seller of personalty is found to be in the business of manufacturing or retailing, i.e., engaged in the business of distributing goods to the public. (*Id.* at p. 254.)

However, as noted above, strict liability is not imposed even if the defendant is technically a "link in the chain" in getting the product to the consumer market if the judicially perceived policy considerations are not satisfied. Thus, a defendant will not be held strictly liable unless doing so will enhance product safety, maximize protection to the injured plaintiff, and apportion costs among the defendants. (*Vandermark v. Ford Motor Co., supra*, 61 Cal.2d at pp. 262–263; *Bay Summit Community Assn. v. Shell Oil Co., supra*, 51 Cal.App.4th at p. 774.)

██ A finance lessor, such as CitiCapital, does not select the specific machine or manufacturer of the machine. Accordingly, unlike a retailer or a commercial lessor, the finance lessor does not maintain an ongoing relationship with a particular manufacturer. Thus, the finance lessor is not in any position to either directly or indirectly exert pressure on the manufacturer to enhance the safety of the product. Therefore, even if the finance lessor's tangential function of providing money to make the purchase possible is characterized as a link in the vertical chain of distribution, imposing strict liability on that finance lessor will not further a critical policy consideration. In other words, strict liability is not justified by the underlying policy.

Similarly, a finance lessor does not play an integral role in the "producing and marketing enterprise" of a product and thus is not strictly liable under a marketing/distribution theory. As discussed above, the court in *Bay Summit Community Assn. v. Shell Oil Co., supra,* 51 Cal.App.4th 762, set forth three factors that are required to establish a sufficient causative relationship between the defendant and the product under this theory, i.e., direct financial benefit from its activities and from the sale of the product; conduct that is a necessary factor in bringing the product to the initial consumer market; and control over, or a substantial ability to influence, the manufacturing or distribution process. (*Id.* at p. 778.)

At least two of these three factors are not present in the case of a finance lessor. It is arguable that the finance lessor's conduct in financing the purchase of the product is necessary to bring the product to the initial consumer market. Nevertheless, any direct financial benefit received by the finance lessor is derived from having placed its money, not the product, into the stream of commerce. It is the lessee that selects, and the third party supplier who supplies, the article to be placed in the stream of commerce, not the finance lessor. Further, as discussed above, the finance lessor does not have control over, or a substantial ability to influence, the manufacturing or distribution process. Thus, again, the factors that form the basis for imposing strict liability on a nonmanufacturing party are not present.

To date, no California court has considered whether the strict products liability doctrine is applicable to finance lessors. However, when faced with this issue, other jurisdictions have ruled that finance lessors are not strictly liable in tort.

For example, in *Nath v. National Equipment Leasing Corp., supra,* 439 A.2d 633, the Pennsylvania Supreme Court held that the finance lessor of a wire and cable stripping machine was not strictly liable for the injuries suffered by a user of that machine. The court held that "[w]hile it is true that the financing makes the purchase possible, and to that limited extent the financier

can be perceived to have participated in the delivery of the product, such a tangential participation in the supplying of the goods does not justify the imposition of strict liability." (*Id.* at p. 636.) The court noted that the finance lessor is not supplying the product, but rather is offering the use of money. (*Ibid.*) Further, financing institutions are not equipped to pass upon the quality of the myriad of products they are called upon to finance nor do they have direct impact upon the manufacturing process of the product to exercise quality control. Finally, the finance lessor's relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and safety of the product. (*Ibid.*)

Similarly, in *Rivera v. Mahogony Corp., supra,* 494 N.E.2d 660, the Illinois Appellate Court held that leasing arrangements that are entered into to provide financing for the purchase of a product are not subject to the imposition of strict tort liability. The court noted that in Illinois, imposition of liability upon all persons in the distributive chain, including commercial lessors, is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product. (*Id.* at p. 662.) However, when the lessor is a finance lessor, the public policy considerations supporting the imposition of strict liability are not furthered by subjecting the lessor to such liability. The finance lessor is not in any position to exert pressure on the manufacturer to enhance safety and any profit reaped by the finance lessor is derived from having placed its money, not the product, into the stream of commerce. (*Id.* at p. 663.) Other courts considering this issue have engaged in similar analyses. (See, e.g., *Abco Metals Corp. v. J.W. Imports Co., Inc.* (N.D.Ill. 1982) 560 F.Supp. 125, affd. *sub nom. Abco Metals Corp. v. Equico Lessors, Inc.* (7th Cir. 1983) 721 F.2d 583; *Wright v. Newman* (8th Cir. 1984) 735 F.2d 1073; *Starobin v. Niagara Mach Corp* (N.Y.App.Div. 1991) 172 A.D.2d 64 [577 N.Y.S.2d 327].)

■ In sum, imposing strict products liability on the lessor under a finance lease, as defined under both the California Uniform Commercial Code and the Uniform Commercial Code, does not further the policy considerations underlying the strict products liability doctrine. A finance lessor's role in the chain of events does not provide a basis for imposition of strict liability. Therefore, as the finance lessor, CitiCapital is not strictly liable for Arriaga's injuries.

    d.   *CitiCapital is not strictly liable as the seller of a used product.*

Arriaga contends there is a triable issue of material fact regarding title to the glue spreader. According to Arriaga, title is unclear at two critical times and the resolution of this issue impacts CitiCapital's liability.

Arriaga first argues that CitiCapital retained title to the machine and thus was the owner at the time of the accident. However, as discussed above, CitiCapital is not strictly liable in its role as finance lessor. The finance lessor is outside the chain of distribution.

Alternatively, Arriaga asserts that it was CitiCapital, and not AVP, that held title to the machine when it was sold to Orepak. Therefore, Arriaga argues, CitiCapital was the seller of a defective machine.

■ However, a seller of used machinery is not strictly liable in tort, unless the seller rebuilds or reconditions the product and thus assumes a role analogous to that of a manufacturer. (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1200–1201 [43 Cal.Rptr.2d 836, 899 P.2d 905].) A commercial dealer in used *goods has* no continuing business relationship with the manufacturer in the course of which that dealer can adjust the cost of protection from strict liability. (*Tauber-Arons Auctioneers Co. v. Superior Court* (1980) 101 Cal.App.3d 268, 283 [161 Cal.Rptr. 789].) Although the retailer of a product may play a substantial part in ensuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end, this risk reduction rationale is inapplicable to a used goods dealer. (*Ibid.*) The used goods dealer is normally entirely outside the original chain of distribution of the product. (*Ibid.*) To impose such liability would, as a practical matter, require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products, thus effecting a radical change in the nature of the used product market. (*Wilkinson v. Hicks* (1981) 126 Cal.App.3d 515, 521 [179 Cal.Rptr. 5].)

A used goods dealer's exemption from strict liability applies to subsequent defects as well. (*LaRosa v. Superior Court* (1981) 122 Cal.App.3d 741, 753–761 [176 Cal.Rptr. 224].) The policy reasons for imposing strict liability also do not apply under those circumstances. (*Ibid.*) To impose such liability would, in effect, render used goods dealers as insurers against defects that came into existence after the original chain of distribution and while the product was under the control of previous consumers. (*Wilkinson v. Hicks, supra*, 126 Cal.App.3d at p. 521.)

Further, the original consumer of a product who sells it to another is not strictly liable. Such an occasional seller of used equipment is not a conduit for the production or distribution of that product. (*Balido v. Improved Machinery, Inc.* (1972) 29 Cal.App.3d 633, 639–640 [105 Cal.Rptr. 890].)

Arriaga argues that this exemption does not apply because CitiCapital was not a seller of used equipment but rather was responsible for the initial distribution of the machine. However, as discussed above, CitiCapital was outside the original chain of distribution and thus is not strictly liable as an entity that was instrumental in placing the product in the stream of commerce.

Arriaga further contends that CitiCapital is not exempt as a seller of used machinery because it is not in any substantial way in the business of selling used equipment. However, assuming CitiCapital sold the machine to Orepak, it was an occasional sale of used equipment and thus is exempt from strict liability.

In sum, CitiCapital is not strictly liable for Arriaga's injuries as either a lessor of new equipment or the seller of used equipment. Accordingly, title to the glue spreader is not an issue of material fact. CitiCapital is entitled to judgment as a matter of law on the strict liability causes of action.

3. *CitiCapital is not liable based on negligence.*

Arriaga argues that CitiCapital is liable as the owner/lessor of the glue spreader for failing to exercise reasonable care to inspect the machine for defects. However, a finance lessor, such as CitiCapital, is a passive lessor whose involvement in the transaction is the equivalent of an extension of credit. As a finance lessor, CitiCapital had neither the opportunity nor the expertise to inspect the machine in order to discover defects. (Cf. *Colonial Pacific v. McNatt* (1997) 268 Ga. 265, 268 [486 S.E.2d 804, 807].)

It is undisputed that CitiCapital never had possession of the machine. Further, there is no evidence that CitiCapital had any notice of the defect. Since the machine was in the sole possession and control of first AVP and then Orepak for nearly five years, and CitiCapital had no notice of the defect, CitiCapital owed no duty to Arriaga to inspect the machine. (*Dickson v. Southern Cal. Edison Co.* (1955) 136 Cal.App.2d 85, 87–88 [288 P.2d 310].)

Arriaga points out that CitiCapital reserved the right in the finance lease to inspect the glue spreader and argues that this right gave rise to a duty on the part of CitiCapital to do so. However, the reservation of the right to inspect, in and of itself, does not vest such control over the equipment as to impose on the lessor any such obligation to a third party. (Cf. *Ulwelling v. Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 135 [23 Cal.Rptr. 631].)

4. *The sale of the machine to Orepak did not carry an implied warranty of merchantability.*

Arriaga asserts that, if the glue spreader was sold at all, it was sold by CitiCapital directly to Orepak. According to Arriaga, an implied warranty of merchantability arose upon that sale by operation of law.

California Uniform Commercial Code section 2314, subdivision (1) provides that a "warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Arriaga argues that, as a lessor of industrial machinery that occasionally sells items that have reverted to it, CitiCapital is a merchant with respect to such industrial machinery.

However, CitiCapital is a finance lessor. Under the California Uniform Commercial Code, a warranty that the goods will be merchantable is not implied in a finance lease. (Cal. U. Com. Code, § 10212, subd. (a).) If no implied warranty of merchantability arises from a finance lease, implying *such* a warranty when a third party acquires the leased goods by paying off that finance lease is contrary to California law.

Moreover, the product a finance lessor deals in is money, not industrial equipment. Accordingly, CitiCapital is not a merchant with respect to industrial machinery. Thus, assuming CitiCapital sold the machine to Orepak, the sale did not carry an implied warranty of merchantability. (*Balido v. Improved Machinery, Inc., supra,* 29 Cal.App.3d at p. 639.)

5. *The trial court's failure to rule on Arriaga's evidentiary objection is harmless.*

In its reply to Arriaga's opposition to the summary judgment motion, CitiCapital included portions of a deposition that had been taken after the motion was filed. Arriaga objected to this "new evidence." However, the trial court did not rule on this objection.

Arriaga argues the trial court erred in failing to rule on his objection. According to Arriaga, this "new evidence" supported CitiCapital's arguments that it did not own the glue spreader at the time of the accident and that the transaction was a finance lease.

As discussed above, whether CitiCapital owned the glue spreader is irrelevant. Further, the documentary evidence alone demonstrates that the transaction was a finance lease. Thus, this "new evidence" was unnecessary to the decision and the trial court's failure to rule on the objection to it is harmless.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Dawson, J., and Hill, J., concurred.