Filed 7/29/21  Lee v. Greyhound Lines CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| QER LEE et al., | C087122 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34200900035502CUPAGDS) |
| v. | |
| GREYHOUND LINES INC., | |
| Defendant and Respondent. | |

In October 2008, a bus, previously part of the fleet operated by defendant Greyhound Lines, Inc. (Greyhound Lines), was involved in a single-vehicle crash caused by the driver falling asleep at the wheel.  The bus was not equipped with passenger seat belts and multiple people died or were injured.  Surviving passengers of the crash and family members of the decedents (plaintiffs) brought a negligence and products liability action against Greyhound Lines for its role in manufacturing, selling, and distributing an allegedly defective bus.

1

Plaintiffs' negligence cause of action, based on a common carrier theory of liability, was dismissed following Greyhound Lines's motion for summary adjudication. Plaintiffs' case thereafter went to trial on a strict liability theory. Following the close of evidence, the jury returned a verdict for Greyhound Lines, finding it did not manufacture, sell, or distribute the bus involved in the crash. Plaintiffs appeal arguing the trial court improperly dismissed their negligence cause of action based on a common carrier theory of liability, interfered with their right to representation of counsel, and improperly instructed the jury in multiple respects. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Underlying Facts*

This lawsuit arises out of an October 2008 bus crash, resulting in the deaths of 10 people and dozens of others being injured. At the time of the crash, the bus was owned by House of Prayer Apostolic Faith Christian Center of Modesto (House of Prayer) and driven by a driver employed by Cobb's Bus Service. The crash occurred when the driver fell asleep and the bus hit a drainage canal on the side of a two-lane road. Several passengers were ejected from the bus upon impact. The bus "was not equipped with occupant restraint systems for its passengers, nor was it required to be so equipped."

Plaintiffs sued Greyhound Lines because, while Greyhound Lines did not own or operate the bus at the time of the crash, the bus was originally made for and at the direction of Greyhound Lines by Motor Coach Industries (Motor Coach).

II

*Summary Adjudication Proceedings*

Plaintiffs' case has previously come before us. (*Lee v. Greyhound Lines, Inc.* (July 21, 2015, C073948) [nonpub. opn.].) At that time, we reversed the trial court's granting of summary judgment in favor of Greyhound Lines and revived plaintiffs' suit

2

because Greyhound Lines failed to show all of plaintiffs' theories of liability lacked merit. (*Ibid.*)

Upon remand, plaintiffs filed a fourth amended complaint alleging, among other things, negligence pursuant to a negligence per se theory that Greyhound Lines was a common carrier. Greyhound Lines moved to summarily adjudicate the cause of action based on that theory because Greyhound Lines "did not accept plaintiffs as passengers and the passengers did not place themselves under [Greyhound Lines's] control, so [Greyhound Lines] did not owe them a common carrier duty as defined under Civil Code [section] 2101." (Capitalization omitted.) Plaintiffs opposed Greyhound Lines's motion. Plaintiffs argued Greyhound Lines was liable as a common carrier because it was the original common carrier affiliated with the bus. Specifically, they asserted the common carrier duty to use the highest care in constructing the bus arose and was breached at the time Greyhound Lines had control of the bus no matter when the unsafe design caused injury or death.

It was undisputed that Greyhound Lines operated the bus from 1993 until 2005, when it no longer had possession of the bus. At the time of the crash, the bus bore both a Texas and California license number and was owned by House of Prayer and driven by an employee of Cobb's Bus Service. The bus, however, continued to bear the Greyhound Lines name and trademark on the exterior of the bus, along with the words "Owned and Operated by Greyhound Lines, Inc. Dallas, Texas."

The trial court agreed with Greyhound Lines and granted summary adjudication of plaintiffs' negligence per se cause of action, finding Greyhound Lines was not liable as a common carrier. The trial court reasoned that, because Greyhound Lines did not actually accept the passengers as passengers and the passengers did not actually place themselves under the control of Greyhound Lines, Greyhound Lines was not a common carrier under Civil Code section 2101.

3

III

*Facts Elicited At Trial*

Plaintiffs went to trial on their causes of action based on strict liability. To prove these claims, plaintiffs sought to show Greyhound Lines manufactured, sold, or distributed the bus involved in the 2008 crash. The following facts were established at trial.

Motor Coach manufactured and supplied Greyhound Lines with a majority of the buses used in its fleet over the course of many decades. Prior to 1987, Greyhound Corporation owned both Greyhound Lines and Motor Coach, along with other companies such as Dial Soap and Armour Meats. In 1987, Greyhound Lines was sold to an investment group and parted ways from Greyhound Corporation.

Prior to 1992, Motor Coach sold Greyhound Lines the MC-9 bus model and intended to rollout the A-3 bus model in 1993. Greyhound Lines, however, did not want the A-3 bus model; they wanted something similar to the MC-9 bus model. Thus, Motor Coach created the MC-12 bus model specifically for Greyhound Lines. The MC-12 bus was the top half of the MC-9 bus and the bottom half of the A-3 bus. The MC-12 bus had never been designed or manufactured before Greyhound Lines requested it. When Greyhound Lines requested the bus, Motor Coach's engineering department was responsible for the design. During the design phase, Motor Coach engineers tested and validated aspects of the bus to ensure the bus met safety standards. After every MC-12 bus had been produced, it was road tested before being delivered to customers, like Greyhound Lines. If the bus did not meet a safety standard, Motor Coach would not deliver the bus and instead would send it back to its plant to be fixed.

As part of the purchase agreement for the MC-12 buses, Greyhound Lines compiled a list of specifications it required to be included on the buses. These specifications included, but were not limited to, the type of engine and transmission, air and cooling system, fuel system, wheels, and extensive selections pertaining to the

4

exterior and interior components. Greyhound Lines also specified many safety components it wished to be included in the MC-12 buses. These included, but were not limited to, a stepwell light, a backup horn, reflectors, fire extinguishers, and passenger handrails. The specifications were selected from Motor Coach's option book. Greyhound Lines was limited in what options it could select; it could only select options from the option book and could not deviate from those options. Passenger seat belts were not an option found in the option book. No other bus manufacturer provided passenger seat belts as an option in 1993.

Motor Coach had an engineer specifically devoted to Greyhound Lines, primarily for maintenance. Greyhound Lines was always interested in maintenance costs, so on a quarterly basis Greyhound Lines and Motor Coach held a meeting to discuss maintenance issues and Motor Coach engineers would investigate and try to fix any issues raised by Greyhound Lines. This included looking at the design of a bus and modifying the design to make a better product in future production, or to do a retrofit campaign to resolve maintenance problems promptly. Greyhound Lines was an important contract to Motor Coach. It was Motor Coach's responsibility to build the buses to the specifications selected by Greyhound Lines and to ensure the buses met all federal standards. Greyhound Lines had no role in manufacturing the MC-12 buses.

Shortly after purchasing the MC-12 bus involved in this case, Greyhound Lines sold it, thus transferring title, to Wilmington Trust, an investment group. Greyhound Lines then leased the bus back until 2005 when it transferred possession to Wilmington Trust. Wilmington Trust took possession of the bus and other MC-12 buses and eventually sold them. After taking possession, Wilmington Trust had a period of time to assess the quality of the buses. If any bus did not meet quality standards, Wilmington Trust returned the bus to Greyhound Lines to fix before taking possession of the bus again. Once the buses met quality standards, Wilmington Trust sold them. In the case of the MC-12 bus involved in the crash, Wilmington Trust sold the bus to Transit Sales

5

International, who then sold it to House of Prayer. Greyhound Lines was not involved in the sale of any bus by Wilmington Trust, but was aware Wilmington Trust sold buses to other organizations.

Based on this evidence, the jury found Greyhound Lines did not manufacture, distribute, or sell the MC-12 bus involved in the 2008 crash. Accordingly, judgment was entered in favor of Greyhound Lines.

Plaintiffs appeal.

## DISCUSSION

## I

### *Greyhound Was Not A Common Carrier Of The Passengers*

Plaintiffs contend the trial court erred in granting Greyhound Lines's motion for summary adjudication on their cause of action alleging Greyhound Lines was a common carrier pursuant to Civil Code section 2101. Relying on the jury instruction defining the duty owed by a common carrier (CACI No. 903) and common knowledge, as stated in *Greyhound Lines Inc. v. Superior Court of Shasta County* (1970) 3 Cal.App.3d 356, 358-359, that passenger safety belts are effective safety devices, plaintiffs argue Greyhound Lines had the duty to construct a safe bus and breached that duty when it failed to have seat belts installed on the bus. Greyhound Lines contends it was not liable as a common carrier because there was no common carrier relationship between itself and the passengers. We agree with Greyhound Lines.

"A trial court properly grants summary [adjudication] when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) 'The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.' [Citation.] [¶] A defendant who moves for summary judgment bears the initial burden to show the action has no merit -- that is, 'one or more elements of the cause of

6

action, even if not separately pleaded, cannot be established, or that there is a complete defense to [that] cause of action.' (Code Civ. Proc., § 437c, subds. (a), (p)(2).) Once the defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. [Citation.] 'From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law.' [Citation.] We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent." (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1293-1294.)

Civil Code section 2101 provides: "A carrier of persons for reward is bound to provide vehicles safe and fit for the purposes to which they are put, and is not excused for default in this respect by any degree of care." While a common carrier owes the highest duty of care in the construction of the vehicle it uses to carry passengers (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1130-1131), the heightened duty exists only as long as the relationship of carrier to passenger lasts. Thus, for instance, a carrier owes a heightened duty to a passenger when the passenger manifests an intention to board a streetcar and the conductor stops to receive him or her. (*Gray v. City of San Francisco* (1962) 202 Cal.App.2d 319, 323.) Our Supreme Court has explained, " ' "[t]he passenger while in actual progress upon his journey is exposed to countless hazards, gives himself wholly in charge of the carrier . . . . But a rule properly ceases with the reason for it; therefore, as a passenger's entrance to the carrier's station is characterized by none of the hazards incident to the journey itself, the rigor of the rule above announced is justly relaxed, in that at such a time and place the carrier is bound to exercise only a reasonable degree of care for the protection of his passengers." ' "

7

(*Churchman v. Bay Area Rapid Transit Dist.* (2019) 39 Cal.App.5th 246, 251, quoting *Falls v. San Francisco etc. R. R. Co.* (1893) 97 Cal. 114, 119.)

Similarly, where a passenger does not give himself to the control of a specific carrier, the reason to attach the common carrier rule to that carrier ceases. Our Supreme Court summarized the reason for the common carrier rule in *Gomez.* (*Gomez v. Superior Court*, *supra*, 35 Cal.4th at pp. 1128-1132.) "Carriers of persons for reward have long been subject to a heightened duty of care. [Citation.] This heightened duty imposed upon carriers of persons for reward stems from the English common law rule that common carriers of goods were absolutely responsible for the loss of, or damage to, such goods. [Citation.] Carriers of goods are bailees and, at 'early law goods bailed were absolutely at the risk of the bailee.' [Citation.] Thus, carriers of goods for reward were ' "responsible absolutely for the goods delivered, even when lost by theft, and regardless of negligence." ' " (*Id.* at pp. 1128-1129.)

"The extension of applying the heightened duty of care for carriers of goods to carriers of persons for reward 'is probably of American origin, finding its earliest expression in 1839 in *Stokes v. Saltonstall* [(1839) 38 U.S. 181 [10 L.Ed. 115]].' [Citation.] In *Stokes*, a passenger in a stagecoach was injured when the coach was upset. The court noted that a carrier of goods was absolutely liable for the loss of or damage to such goods regardless of the cause 'except the act of God, and the public enemy,' but recognized that 'a contract to carry passengers differs from a contract to carry goods.' [Citation.] 'But although he does not warrant the safety of the passengers, at all events, yet his undertaking and liability as to them, go to this extent: that he . . . shall possess competent skill; and that as far as human care and foresight can go, he will transport them safely.' " (*Gomez v. Superior Court*, *supra*, 35 Cal.4th at p. 1129.)

"The rule that carriers of persons for reward must exercise great care for the safety of their passengers was adopted in California in 1859 in *Fairchild v. The California Stage Company* (1859) 13 Cal. 599, in which a passenger was injured when the stagecoach in

8

which she was riding overturned.  The court rejected the proposition that a carrier of persons for reward warrants the safety of its passengers, but held the carrier to a high duty of care:  'While it is true that the proprietors of a stage-coach do not warrant the safety of passengers in the same sense that they warrant the safe carriage of goods, yet they do warrant that safety so far as to covenant for the exercise of extraordinary diligence and care to insure it; and they do this as common carriers.'  [Citation.]  [¶]  The California Legislature soon adopted a comprehensive scheme governing carriage.  Civil Code section 2085, which was enacted in 1872 and remains unchanged today, defines a 'contract of carriage' in extremely broad terms as 'a contract for the conveyance of property, persons, or messages, from one place to another.' "  (*Gomez v. Superior Court*, *supra*, 35 Cal.4th at p. 1130.)

From this history, it is clear the reason for the common carrier rule is to hold those completely in control of a vehicle to a higher standard of care regarding the passengers who and goods that are submitted to the custody and care of that vehicle.  The doctrine has always depended on a relationship between the parties.  Whether it be characterized as a bailor and bailee relationship or a contract of carriage, there needs to be a relationship giving rise to a covenant for the exercise of extraordinary diligence and care. The mere fact that Greyhound Lines is a carrier for hire does not matter unless it was the carrier of these passengers and responsible for them at the time of the crash.  Here, it is undisputed Greyhound Lines did not own or operate the bus at the time of the crash. Thus, summary adjudication was properly granted.

II

*Plaintiffs Forfeited Their Claim Of Judicial Interference*

Plaintiffs contend the trial court interfered with their right to representation of counsel by limiting who could deliver an opening statement and question witnesses to a single attorney without stipulation or agreement, instead of permitting each attorney, one attorney representing 30 plaintiffs and the other representing six plaintiffs, to perform all

9

tasks. During trial, however, plaintiffs' attorneys agreed to present their case as co-lead counsel and did not object to the trial court's classification and treatment of them as such. Accordingly, plaintiffs forfeited their appellate claim of judicial interference.

A

*Background*

Michael Shea represented six plaintiffs and Scott Fielder represented 30. Despite their representation of different plaintiffs, Shea and Fielder filed a joint trial brief and argued all motions in limine as colead counsel. Indeed, during a pretrial discussion regarding a media request, the trial court asked whether the attorneys were "co-lead counsel," to which Fielder responded in the affirmative.

After the jury was empaneled and before opening statements occurred, Shea argued to the court the propriety of plaintiffs' PowerPoint slides to be used during plaintiffs' opening statement and left it to Fielder to argue against Greyhound Lines's use of certain slides. During plaintiffs' opening argument, Shea introduced himself and Fielder as counsel for plaintiffs and described the anticipated evidence. Shea then ended his opening statement by concluding, "[w]e look forward, Mr. Fielder and I, to presenting this case to you, and thank you for listening to us."

Following a recess, Fielder inquired of the trial court that "because we represent different plaintiffs, I might like to speak to the jury for a few minutes about just a few issues. [¶] I'm not going to repeat what was said. If the Court feels that that's -- would be unfair given -- I'm satisfied with counsel's opening statement." The trial court stated it believed "we've already gone down that road," but invited Fielder to make a statement to the jury announcing that he joined in Shea's opening argument. Fielder requested the court make that announcement instead. When the jury returned, the trial court announced: "So ladies and gentlemen, I neglected to tell you earlier that we do have several lawyers for the plaintiffs. So we generally do this one opening statement per side, so Mr. Shea's was meant to be the opening for all the plaintiffs."

10

Thereafter, Shea or Fielder examined or cross-examined witnesses, but they did not examine or cross-examine the same witness. Neither attorney raised a concern about this to the court.

B

*Plaintiffs' Claim Is Forfeited*

"Failure to register a proper and timely objection to a ruling or proceeding in the trial court [forfeits] the issue on appeal." (*Bell v. American Title Ins. Co.* (1991) 226 Cal.App.3d 1589, 1602, citing *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [failure to object to misconduct]; *Cummings v. Cummings* (1929) 97 Cal.App. 144, 149 [failure to oppose motion].) The purpose of the forfeiture rule is to encourage parties to bring errors to the attention of the trial court " ' "so that they may be corrected or avoided and a fair trial had." ' " (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265.) Having failed to object to the trial court's treatment of the two attorneys as colead counsel, plaintiffs have forfeited the right to do so for the first time on appeal.

III

*Instructional Error Claims*

Plaintiffs raise multiple claims of instructional error. Their claims center around the argument that the trial court erred by failing to instruct on their theory of liability -- that Greyhound Lines was liable because it was directly involved in the manufacture, distribution, and sale of the MC-12 bus involved in the bus crash. Indeed, plaintiffs contend the court erred by instructing the jury with Greyhound Lines's "marketing enterprise" theory that Greyhound Lines was outside the marketing stream, and thus if held strictly liable, it must be under that theory.

We review plaintiff claims of instructional error de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

11

## A

### *Trial Court Proceedings*

During jury instruction discussions, the trial court voiced its concern that the terms distribution and sale were not defined. After discussing the issue with the parties, the trial court adopted Greyhound Lines's special instruction delineating the three elements taken from *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762. The trial court further refused to instruct the jury with plaintiffs' proposed special instruction pertaining to the stream of commerce theory found in *Hernandezcueva v. E.F. Brady Co., Inc.* (2015) 243 Cal.App.4th 249 and their special instruction seeking to define a manufacturer as including those who provide specifications to a third party as articulated in *Dow v. Holly Manufacturing Co.* (1958) 49 Cal.2d 720.

Ultimately, the trial court gave several jury instructions pertaining to strict liability. It began by instructing the jury that "Plaintiffs claim that they were harmed by a product distributed, manufactured, or sold by Greyhound Lines, Inc. that was defectively designed." (CACI No. 1200.) The trial court then instructed the jury with the special instruction defining distribution and sale. The instruction provided: "Plaintiffs claim Greyhound Lines, Inc. is responsible for an alleged defect in the 1993 [Motor Coach] MC-12 bus because Greyhound Lines, Inc. sold or distributed the bus. To establish that Greyhound Lines, Inc. sold or distributed the bus, Plaintiffs must prove all of the following: [¶] (1) That Greyhound Lines, Inc. received a direct financial benefit from the sale of the bus; [¶] (2) That Greyhound Lines, Inc.'s conduct was a necessary factor in bringing the bus to the initial consumer market; and [¶] (3) That Greyhound Lines, Inc. had control over, or a substantial ability to influence, the manufacturing or distribution process of the 1993 [Motor Coach] MC-12 bus." The trial court then instructed the jury on plaintiffs' theory of strict liability pertaining to the consumer expectation test (CACI No. 1203) and risk-benefit test (CACI No. 1204). The first element of each test was that "Greyhound Lines, Inc. manufactured, distributed, or sold the bus."

12

During jury deliberations, the jury asked for the definition of "initial consumer market" found in the special instruction. Over plaintiffs' objection, the trial court responded, "[t]he meaning of 'initial consumer market' is the first point of purchase of a new unit of a product by the product's intended purchaser."

B

*Applicable Law*

" '[T]he concept of strict products liability was created and shaped judicially. In its evolution, the doctrinal encumbrances of contract and warranty, and the traditional elements of negligence, were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability.' [Citation.] Our Supreme Court first recognized the doctrine of strict liability for defective products more than 50 years ago. [Citation.] Initially limited to manufacturers, the doctrine reflected judicial concern that 'the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market, rather than by the injured persons who are powerless to protect themselves.' [Citation.]

"Soon after, [our] Supreme Court extended strict liability to retailers: 'Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship.' [Citation.]

13

"Our Supreme Court has 'given [the] rule of strict liability a broad application.' [Citation.] 'Such a broad philosophy evolves naturally from the purpose of imposing strict liability . . . . Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them.' [Citation.] In its first decade, the rule was made applicable to numerous businesses in the chain of distribution of a product, including bailors and lessors, wholesalers and distributors, and sellers of mass-produced homes. [Citation.]

"Interpreting these foundational precedents, courts have generally applied the doctrine of strict products liability to entities 'involved in the vertical distribution of consumer goods,' where the policies of the doctrine support its application. [Citation.] 'Although these defendants were not necessarily involved in the manufacture or design of the final product, each was responsible for passing the product down the line to the consumer. Thus, the parties were "able to bear the cost of compensating for injuries" [citation] and 'play[ed] a substantial part in insuring that the product [was] safe or . . . [were] in a position to exert pressure on the manufacturer to that end." ' [Citation.] 'Beyond manufacturers, anyone identifiable as "an integral part of the overall producing and marketing enterprise" is subject to strict liability.' " (*Bolger v. Amazon.com, LLC* (2020) 53 Cal.App.5th 431, 447-448.)

" 'The strict liability doctrine derives from judicially perceived public policy considerations, i.e., enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants. [Citations.] Where these policy justifications are not applicable, the courts have refused to hold the defendant strictly liable even if that defendant could technically be viewed as a " 'link in the chain' " in getting the product to the consumer market. [Citation.] In other words, the facts must establish a sufficient causative relationship or connection between the defendant and the product so as to satisfy the policies underlying the strict liability doctrine.' " (*Bolger v.*

14

*Amazon.com, LLC*, *supra*, 53 Cal.App.5th at p. 449, quoting *Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527, 1535.)

Entities not in the vertical chain of commerce may also be held strictly liable. In *Bay Summit*, the plaintiffs asserted products liability claims against the manufacturers of a plastic plumbing system and a supplier of plastic resin, alleging that the fittings in the plumbing system were defective. (*Bay Summit Community Assn. v. Shell Oil Co.*, *supra*, 51 Cal.App.4th at pp. 767-769.) At trial, the evidence showed that the supplier's resin was used in the system's plastic pipes, but the plaintiffs submitted no evidence that the resin was used in the defective fittings or that the resin itself was defective. (*Ibid.*) The plaintiffs' theory at trial was that the supplier was strictly liable for the defective plumbing system not as a resin supplier, but as a participant in the marketing and distribution of the system. (*Id.* at p. 771.)

In affirming the judgment in favor of the plaintiffs, the appellate court examined the principles under which entities may be subject to strict liability for playing a role in the marketing of a product. (*Bay Summit Community Assn. v. Shell Oil Co.*, *supra*, 51 Cal.App.4th at p. 773.) Based on an examination of then-existing case authority, the court concluded that a defendant outside the vertical chain of commerce may be held strictly liable "if three factors are present: (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process." (*Id.* at p. 776.)

## C

### *The Trial Court Did Not Err By Giving The*
### *Special Instruction Defining Distribution And Sale*

Plaintiffs contend the trial court erred by instructing the jury with the special instruction defining distribution and sale. Plaintiffs argue that instruction was inapplicable to their case because it was relevant to only those outside the vertical chain of commerce and not to those in the vertical chain as they alleged Greyhound Lines was in relation to the MC-12 bus. We disagree.

"Giving an instruction that is correct as to the law but irrelevant or inapplicable is error." (*People v. Cross* (2008) 45 Cal.4th 58, 67.) Plaintiffs contend their theories of strict liability were premised on Greyhound Lines's direct involvement in the design, sale, and distribution of the MC-12 bus, and thus the special instruction pertaining to market participants outside the vertical chain of distribution was inapplicable to the case. Plaintiffs' argument is premised on the assumption Greyhound Lines was in the vertical chain of commerce because it sold the bus to Wilmington Trust, who then sold it to Transit Sales International, who then sold it to House of Prayer.

While Greyhound Lines may be in the vertical chain of commerce as it relates to the used MC-12 bus eventually sold to House of Prayer, that is not the relevant inquiry for strict liability purposes. Indeed, purveyors of *used goods* are rarely held strictly liable and are considered "outside the original chain of distribution of the product." (*Arriaga v. CitiCapital Com. Corp.*, *supra*, 167 Cal.App.4th at p. 1540.) Further, that is not the theory plaintiffs advanced at trial. Plaintiffs did not argue Greyhound Lines refurbished the MC-12 bus or warranted its fitness as if it were new, which would be required to hold it liable for selling and distributing a bus that had been used for several years before it was sold further down the stream of commerce. (See *ibid.*)

Instead, the relevant inquiry is into Greyhound Lines's role in bringing the MC-12 bus to the consumer market. (*Arriaga v. CitiCapital Com. Corp.*, *supra*, 167 Cal.App.4th

16

at pp. 1534-1535 [courts have held entities liable where they have placed the product on the market and/or played a role in getting the product to market].)  Greyhound Lines's role in that regard was not in the vertical chain of commerce because it, Greyhound Lines, was the intended consumer market, i.e., the intended purchaser of the relevant product.  Greyhound Lines did not pass the product to the intended purchaser through commerce, but used the product in its services.  That said, Greyhound Lines's customers and other intercity transit customers were also the intended consuming public of the MC-12 bus.  But Greyhound Lines did not bring the bus to market as a seller or distributor in the vertical chain of commerce.  Indeed, Greyhound Lines did not sell their customers a bus.  Instead, Greyhound Lines was an entity that exerted outside influence on the manufacture, sale, and distribution of the MC-12 bus.  Thus, Greyhound Lines was outside the vertical chain of commerce as it related to the MC-12 bus.  Accordingly, the factors articulated in *Bay Summit* were applicable to this case and the trial court did not err by instructing the jury with the special instruction using those factors to define distribution and sale.

D

*The Trial Court Did Not Err When Defining Initial Consumer Market*

Plaintiffs contend the trial court erred by defining the term initial consumer market as the first point of purchase of a new unit of a product by the product's intended purchaser in response to a jury question.  Specifically, plaintiffs argue the court's definition was given in error because it limited liability for a defective product "to the point of the initial purchase" and "cut off the entire vertical chain of liable parties except as to the manufacturer."  We disagree.

The court's answer to the jury's question explicitly stated the relevant purchase was to the intended purchaser not necessarily the initial purchase.  This did not cut off liability to those involved in retailing or otherwise assisting the manufacturer in bringing a product to market.  As courts have noted, more than just a manufacturer is involved in

17

bringing a product to market.  (*Bay Summit Community Assn. v. Shell Oil Co.*, *supra*, 51 Cal.App.4th at pp. 772-773 [retailers, wholesalers, and developers also serve a function in bringing products to market and can be held strictly liable].)

But, as the trial court correctly pointed out by its focus on the intended purchaser of a new product, strict liability typically ends after the product falls into the hands of the intended consumer of that new product.  "[A] seller of used machinery is not strictly liable in tort, unless the seller rebuilds or reconditions the product and thus assumes a role analogous to that of a manufacturer.  [Citation.]  A commercial dealer in used goods has no continuing business relationship with the manufacturer in the course of which that dealer can adjust the cost of protection from strict liability.  [Citation.]  Although the retailer of a product may play a substantial part in ensuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end, this risk reduction rationale is inapplicable to a used goods dealer.  [Citation.]  The used goods dealer is normally entirely outside the original chain of distribution of the product.  [Citation.]  To impose such liability would, as a practical matter, require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products, thus effecting a radical change in the nature of the used product market."  (*Arriaga v. CitiCapital Com. Corp.*, *supra*, 167 Cal.App.4th at p. 1540.)  "To impose such liability would, in effect, render used goods dealers as insurers against defects that came into existence after the original chain of distribution and while the product was under the control of previous consumers."  (*Ibid.*)  Accordingly, the trial court did not err.

E

*The Trial Court Did Not Err By Refusing To Instruct The Jury*

*With Plaintiffs' Proposed Instruction On The Stream Of Commerce Theory*

Plaintiffs requested the court instruct the jury with a special instruction on the stream of commerce theory as articulated in *Hernandezcueva v. E.F. Brady Co., Inc.*, *supra*, 243 Cal.App.4th at page 249.  That proposed instruction provided:  "Plaintiffs

18

claim that the defendant, Greyhound Lines, Inc., played an integral role in . . . placing the MC-12 motorcoach in the stream of commerce. To establish this claim, plaintiffs must prove all of the following: [¶] 1) That Greyhound Lines, Inc. w[as] in a position to have influenced the design of the MC-12 motorcoach; [¶] 2) At the time the MC-12 motorcoach . . . was built and sold, it had a design defect in that the MC-12 had no passenger seat belts; [¶] 3) The absence of passenger seat belts was a substantial factor in causing injury or death of the passengers on the motorcoach." Plaintiffs contend the trial court erred by failing to deliver this instruction. We disagree.

" ' "[P]arties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.] '*A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable* since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented.' " ' " (*Ayala v. Arroyo Vista Family Health Center* (2008) 160 Cal.App.4th 1350, 1358.)

Plaintiffs argue their proposed instruction should have been given because it contained a rule applicable to their case. Relying on *Hernandezcueva*, plaintiffs contend "a service provider could be held strictly liable for a defective product if it was in a position to enhance product safety or exert pressure on the manufacturer to promote safety and the [service provider] was big enough to bear the costs of compensating for injuries." Taking plaintiffs' argument at face value, we conclude it meritless because, even if *Hernandezcueva* held what plaintiffs state, that is not what their proposed instruction said. Plaintiffs' proposed instruction sought to hold Greyhound Lines strictly liable by merely being "in a position to have influenced the design of the MC-12 motorcoach." The proposed language lacks the qualifications plaintiffs say exist in *Hernandezcueva*, i.e., that the service provider be in a position to enhance product safety and that the service provider be big enough to bear the costs of compensating for injuries.

19

In any event, the applicability of the stream of commerce theory as articulated in *Hernandezcueva* is completely unsupported by the evidence, contrary to plaintiffs' appellate contention. " '[U]nder the stream-of-commerce approach to strict liability[,] no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability. It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product (and not the defendant's legal relationship (such as agency) with the manufacturer or other entities involved in the manufacturing-marketing system) which calls for imposition of strict liability.' " (*Hernandezcueva v. E.F. Brady Co.*, *supra*, 243 Cal.App.4th at pp. 257-258.) Thus, the inquiry before the *Hernandezcueva* court, and a fact finder determining whether strict liability is applicable to a service provider, "requires a fact-sensitive examination into whether the 'service aspect predominate[d] and any product sale [was] merely incidental to the provision of the service.' " (*Id.* at p. 262.)[1]

Indeed, "the imposition of strict liability hinges on the extent to which a party was 'responsible for placing products in the stream of commerce.' [Citation.] When the purchase of a product 'is the primary objective or essence of the transaction, strict liability applies even to those who are mere conduits in distributing the product to the consumer.' [Citation.] In contrast, the doctrine of strict liability is ordinarily inapplicable to transactions 'whose primary objective is obtaining services,' and to transactions in which the 'service aspect predominates and any product sale is merely

---

[1]     Before strict liability is deemed appropriate, the fact finder must also weigh the extent to which the service provider exerted control over the manufacturer and the potential safety of the product. (*Hernandezcueva v. E.F. Brady Co.*, *supra*, 243 Cal.App.4th at p. 258.)

20

incidental to the provision of the service.' " (*Hernandezcueva v. E.F. Brady Co.*, *supra*, 243 Cal.App.4th at p. 258.)

Here, the evidence demonstrated the product's sale into the stream of commerce was not incidental to the service Greyhound Lines provided. Greyhound Lines was in the business of transporting customers on the MC-12 bus. It did not provide its customers with the MC-12 bus as a product affiliated with that service. Because there was no evidence establishing Greyhound Lines was anything other than a service provider as it related to the MC-12 buses' entry into the consumer market, the stream of commerce theory was irrelevant to plaintiffs' case. Accordingly, the trial court did not err by refusing to instruct the jury on that theory.

F

*The Trial Court Did Not Err By Refusing To Instruct The*

*Jury With Plaintiffs' Proposed Instruction On Manufacturers Of A Product*

Plaintiffs requested the trial court instruct the jury with a special instruction clarifying who may be held strictly liable as a manufacturer as announced in *Dow v. Holly Manufacturing Co.*, *supra*, 49 Cal.2d at page 720. That instruction provided: "A defendant whose product is built wholly by another entity pursuant to the defendant's specifications is responsible for the product as the manufacturer of the product." Plaintiffs contend the trial court erred by failing to instruct the jury pursuant to this instruction. We disagree.

" 'A court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomprehensible to the average juror, and ordinarily has no duty to modify a proposed instruction. [Citations.] A court may refuse a proposed instruction if other instructions given adequately cover the legal point.' " (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80.)

Plaintiffs argue that, because the court refused to give their requested instruction, the term manufacturer was left undefined and the jury had no concept of what the term

21

manufacturer meant for the purposes of their case. Not so. This jury was told that "[w]ords and phrases not specifically defined in the instructions are to be applied using their ordinary, everyday meanings." The term "manufacturer" is not outside a reasonable juror's common usage such that it needed to be defined. (*See Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 685 [the dictionary definition of " '[m]anufacture' " means " 'something made from raw materials by hand or by machinery' "].) Also, plaintiffs' proposed jury instruction did not define what a manufacturer was, only that it included a defendant who provided specifications to an entity for the purposes of building the product. On this point, the instruction was misleading.

The evidence did not establish Greyhound Lines had control over the specifications by which Motor Coach would build the MC-12 bus, especially as it related to the use of seat belts. The evidence showed the "specifications" were selected by Greyhound Lines from Motor Coach's list of options found in Motor Coach's option book. The evidence further showed Greyhound Lines was limited to selecting from those options and could not deviate in any way from the options provided. The *Dow* case cited by plaintiffs as support for the proposed instruction stands for the proposition that a contractor who provides a product and vouches for the condition of a product made by a subcontractor adopts the negligent acts of the subcontractor and can be held strictly liable for the product's defect. (*Dow v. Holly Manufacturing Co.*, *supra*, 49 Cal.2d at pp. 727-728.) That did not happen here. Greyhound Lines did not adopt Motor Coach's work as its own, nor did it control the specification by which Motor Coach built the MC-12 bus. The specifications and overall design of the MC-12 bus were within Motor Coach's control and not Greyhound Lines's control. Thus, the rule articulated in *Dow* is inapplicable and the trial court did not err by refusing to instruct the jury accordingly.

22

DISPOSITION[2]

The judgment is affirmed.  Greyhound Lines is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

/s/
Robie, Acting P. J.

We concur:

/s/
Hoch, J.

/s/
Renner, J.

---

[2]    Greyhound Lines's motion to strike portions of plaintiffs' reply brief is granted only as to attachment 4, which is a picture of the MC-12 bus after the crash.  The proper procedure for plaintiffs to introduce such evidence to this court was to make it part of the appellate record through designation or augmentation.  (Cal. Rules of Court, rules 8.121, 8.155.)  We deny Greyhound Lines's motion to the extent it seeks to strike portions of plaintiffs' reply brief allegedly raising an argument challenging the verdict form. Plaintiffs do no such thing.  Plaintiffs' statements were confined to their argument that Greyhound Lines improperly stated the facts in the respondent's brief in light of the special verdict provided to the jury and for the purpose of reviewing their instructional error claims.  While some of plaintiffs' statements are irrelevant to our review, they did not raise arguments meant to supplement their opening brief.  We also deny Greyhound Lines's motion to strike attachment 1, a picture of a 1964 school bus equipped with seat belts, because it was excluded from evidence.  This picture appears to have been admitted into evidence as exhibit 51 and was testified to by plaintiffs' seat belt expert as evidence seat belts were feasible at the time the MC-12 bus was designed and manufactured.